2011 UT 18

HAROLD SELMAN, INC.; Fred Selman; Laura Selman; and Bret Selman, Plaintiffs, Counterclaim Defendants, and Petitioners,

v.

BOX ELDER COUNTY, Defendant, Counterclaim Plaintiff, and Respondent.

No. 20090479.

Supreme Court of Utah.

March 29, 2011.

Shaun L. Peck, Brandon J. Baxter, Logan, for plaintiffs.

Stephen R. Hadfield, Brigham City, for defendant.

Associate Chief Justice DURRANT, opinion of the Court:

## INTRODUCTION

¶ 1 Fred, Laura, and Bret Selman, petitioners in this case, are principals of Harold Selman, Inc. (collectively, the "Selmans"). The Selmans own property that is bisected by the border of Box Elder County and Cache County. Running through the property is a trail that connects the cities of Mantua and Paradise. In 2007, both counties passed resolutions designating the trail as a county road. Shortly thereafter, Box Elder County commenced road construction activities on the trail. As a result of the construction, the Selmans brought several actions against Box Elder County alleging that the county's action violated numerous statutes. Additionally, the Selmans sought arbitration from the Office of the Property Rights Ombudsman (the "Ombudsman's Office"). The Ombudsman's Office accepted the case for arbitration, but Box Elder County sought to stay the arbitration and counterclaimed with a quiet-title action, contending it was the actual owner of the trail.

1. Utah Code Ann. §§ 13–43–101 to –206 (2009).

¶ 2 The district court stayed the arbitration, bifurcated the case, and held that the Ombudsman's Office did not have statutory authority to arbitrate the action since the threshold issue of ownership was in dispute. The court of appeals upheld the district court's decision. We granted certiorari on the issue of "whether the court of appeals erred in affirming the district court's construction of the scope of the arbitration provision of the Property Rights Ombudsman Act." We hold that the plain language of the Property Rights Ombudsman Act [1] (the "Ombudsman Act" or the "Act") grants the Ombudsman's Office authority to arbitrate the threshold issue of property ownership in takings and eminent domain disputes. Therefore, we reverse.

## BACKGROUND

¶ 3 The Selmans own a parcel of real property (the "Property") that is bisected by the border of Box Elder County and Cache County. Historically, the Selmans have used the Property as a summer grazing pasture for their livestock. They currently use the Property for farming, ranching, and other agricultural pursuits. Running through the Property is a trail that connects the cities of Mantua and Paradise. Survey maps dating as early as 1878 show the trail connecting the two cities. The Selmans use the trail to move cattle between portions of the Property.

¶ 4 When the Selmans acquired the Property in 1952, the abstracts of title prepared for the Property did not indicate any recorded public or private easement, grant of public roadway, or any other reservation indicating a public interest in the road. From the time of the original land grant to the present, no legal action has been taken to adjudicate any path or trail on the Property as a public road.

¶ 5 In 2007, both Box Elder and Cache County passed resolutions designating, based on historical maps, the trail across the Property as a county road. Shortly thereafter, Box Elder County commenced road construction activities on the trail, including the re-

moval of a gate owned by the Selmans that blocked the trail. The Selmans allege Box Elder County's construction work "doubled, and in some cases, tripled the width of the trail" by cutting into portions of the Property that Box Elder County "previously acknowledged to be private property." The Selmans further allege that this has "damaged the watershed . . . and compromised the [P]roperty's use for agricultural purposes."

¶ 6 In reaction to these construction activities, the Selmans immediately filed suit against Box Elder County alleging violations of chapter 41 of title 17 of the Utah Code,[2] the National Environmental Policy Act of 1969,[3] and the Land Conservation Easement Act.[4] The Selmans also sought injunctive relief to stop Box Elder County's road construction activities. The district court partially granted the Selmans' request for injunctive relief and entered a temporary restraining order stopping all road construction activities and ordering reinstallation of the gate. But because litigation was pending regarding ownership of the trail, the district court did not allow the Selmans to lock the gate to close the trail.

¶ 7 Two weeks after the entry of the temporary restraining order, the Selmans filed an additional claim against Box Elder County and asserted additional causes of action. Specifically, the Selmans alleged violation of the County Land Use, Development, and Management Act;[5] trespass; and inverse condemnation. Both parties later agreed to consolidate the two actions against Box Elder County.

¶ 8 In addition to the claims against Box Elder County, the Selmans filed suit against Cache County to stop it from beginning road construction on its side of the trail. In the complaint against Cache County, the Selmans asserted the same six claims they had asserted against Box Elder County in their two previous complaints.

¶ 9 After filing the second suit against Box Elder County and the suit against Cache County, the Selmans requested arbitration of the dispute from the Ombudsman's Office pursuant to Utah Code section 13–43–204. Two weeks later, the Ombudsman's Office accepted the Selmans' arbitration request.

¶ 10 A week after the Selmans requested arbitration, Box Elder County answered the Selmans' complaints and asserted a counterclaim to quiet title in the trail. Additionally, Box Elder County filed a motion to bifurcate its quiet-title claim from the Selmans' claims and to stay the arbitration and all discovery on the Selmans' claims until the quiet-title counterclaim was resolved. Cache County followed by filing a similar answer and counterclaim in its case.

¶ 11 After hearing oral arguments, the district court bifurcated the case and granted Box Elder County's motion to stay arbitration with the Ombudsman's Office. The district court held that the threshold question of ownership of the disputed trail should be resolved before the Ombudsman's Office considered the eminent domain issue and that bifurcation was appropriate because determination of ownership would likely lead the parties to settle.

¶ 12 After the district court's decision, the Selmans appealed to the Utah Court of Appeals. The Selmans argued that it was not proper for the district court to stay the arbitration proceedings because the matter was properly before the Ombudsman's Office. Specifically, the Selmans argued that Box Elder County's quiet-title claim falls under the umbrella of "takings or eminent domain issues" appropriate for the Ombudsman's Office to consider under the Ombudsman Act. Thus, the Selmans argued, the quiet-title matter should be included in, not litigated prior to, the arbitration.

¶ 13 The Utah Court of Appeals upheld the district court's decision. The court of appeals reasoned that the provision of the Ombudsman Act granting the Ombudsman's Office authority to arbitrate takings and eminent domain disputes should be read narrowly so as not to include issues "peripherally

2. *Id.* §§ 17–41–101 to –503 (2009).

3. 42 U.S.C. §§ 4321–47 (2009).

4. Utah Code Ann. §§ 57–18–1 to –7 (2009).

5. Utah Code Ann. §§ 17–27a–101 to –803 (2009).

related to a takings claim," such as ownership of the property in dispute.[6] Additionally, the court reasoned that since the statute suggests that only property owners may invoke the authority of the Ombudsman's Office and that since takings claims begin with the premise that ownership is not in dispute, ownership of the property "is a threshold issue to the subsequent question of whether there has been a taking" and thus should be "resolved judicially before arbitration."[7]

¶ 14 The Selmans filed a Petition for Writ of Certiorari in June 2009, which we granted on the issue of "whether the court of appeals erred in affirming the district court's construction of the scope of the arbitration provision of the Property Rights Ombudsman Act." We have jurisdiction under Utah Code section 78A–3–102(3)(a).

## STANDARD OF REVIEW

██ ¶ 15 On certiorari, we review the court of appeals' decision for correctness, "giving no deference to its conclusions of law."[8]

## ANALYSIS

¶ 16 We granted certiorari on the issue of whether the court of appeals erred in affirming the district court's construction of the scope of the arbitration provision of the Ombudsman Act. This requires us to determine whether the Ombudsman's Office has authority under the Ombudsman Act to address the issue of property ownership as it applies to takings and eminent domain disputes. We hold that it does. Thus, the district court erred in staying the arbitration proceedings.

## I. THE PLAIN LANGUAGE OF THE OMBUDSMAN ACT ALLOWS THE OMBUDSMAN'S OFFICE TO ARBITRATE PROPERTY OWNERSHIP AS IT APPLIES TO TAKINGS AND EMINENT DOMAIN DISPUTES

¶ 17 The arbitration provision of the Ombudsman Act does not support the court of appeals' conclusion that the issue of property ownership lies beyond the statutory authority of the Ombudsman's Office. Rather, the plain language of the Ombudsman Act indicates that the Ombudsman's Office has authority to arbitrate the issue of property ownership as it applies to takings and eminent domain disputes.

██ ¶ 18 When interpreting statutes, our " 'primary objective ... is to give effect to the legislature's intent.' "[9] "To discern legislative intent, 'we look first to the statute's plain language.' "[10] In doing so, "[w]e presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning."[11] Additionally, " '[w]e read the plain language of the statute as a whole [ ] and interpret its provisions in harmony with other statutes in the same chapter.' "[12] "When the plain meaning of the statute can be discerned from its language, no other interpretive tools are needed."[13]

¶ 19 We hold in Part I.A. that the Ombudsman's Office has authority to determine the issue of property ownership as it relates to takings and eminent domain issues. We conclude that the plain language of the Ombudsman Act grants the Ombudsman's Office authority to arbitrate disputes involving takings and eminent domain issues and that the issue of ownership is a necessary element to all

6. *Harold Selman, Inc. v. Box Elder Cnty.*, 2009 UT App 99, ¶ 11, 208 P.3d 535.

7. *Id.* ¶ 9.

8. *State v. Baker*, 2010 UT 18, ¶ 7, 229 P.3d 650.

9. *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (quoting *Savage v. Utah Youth Vill.*, 2004 UT 102, ¶ 18, 104 P.3d 1242).

10. *Id.* (quoting *Martinez v. Media–Paymaster Plus/Church of Jesus Christ of Latter-day Saints*, 2007 UT 42, ¶ 46, 164 P.3d 384).

11. *Martinez*, 2007 UT 42, ¶ 46, 164 P.3d 384 (internal quotation marks omitted).

12. *LPI Servs.*, 2009 UT 41, ¶ 11, 215 P.3d 135 (second alteration in original) (quoting *Miller v. Weaver*, 2003 UT 12, ¶ 17, 66 P.3d 592).

13. *Id.* (citing *Martinez*, 2007 UT 42, ¶ 47, 164 P.3d 384).

takings and eminent domain claims. In Part I.B., we hold that the Selmans qualify as property owners for purposes of invoking the Ombudsman Act because the mere allegation of property ownership is sufficient to invoke the authority of the Ombudsman's Office.

A. *The Ombudsman's Office Has Authority to Arbitrate the Issue of Property Ownership as It Applies to Takings and Eminent Domain Disputes Because Property Ownership Is an Essential Element of All Takings and Eminent Domain Claims*

¶ 20 Because the Ombudsman's Office has authority to arbitrate disputes involving takings and eminent domain claims and because property ownership is an essential element of all such claims, the court of appeals erred when it concluded that the issue of property ownership does not fall under the statutory responsibilities of the Ombudsman's Office.

¶ 21 The Ombudsman Act grants the Ombudsman's Office specific authority to use alternative dispute resolution to resolve disputes involving takings and eminent domain issues. The Act states in relevant part that "[i]f requested by the private property owner and otherwise appropriate, the Office of the Property Rights Ombudsman shall mediate, or conduct or arrange arbitration for, disputes between private property owners and government entities that involve: . . . takings or eminent domain issues. . . ."[14]

¶ 22 The Act defines "[t]akings and eminent domain law" as "the provisions of the federal and state constitutions, the case law interpreting those provisions, and any relevant statutory provisions that: . . . involve constitutional issues arising from the use or ownership of real property. . . ."[15] Thus, the Act's plain language specifically incorporates our case law interpreting the takings and eminent domain provisions of the federal and state constitutions into the statutory defini-

tion of the subject matter over which the Ombudsman's Office has authority.

¶ 23 When interpreting the takings and eminent domain provisions of the state constitution, we have held that "[a] takings claim presents two distinct inquiries: 'First, the claimant must demonstrate some [protectable] interest in property. If the claimant possesses a [protectable] property interest, the claimant must then show that the interest has been taken or damaged by government action.'"[16] Thus, our case law establishes that possession of a "protectable interest" is the first required element in any takings claim. And to the degree it is necessary to establish a takings claim, the Act's plain language incorporates the "protectable interest" element into the subject matter over which the Ombudsman's Office has authority. Property ownership is a protectable interest. So the Selmans must establish that they own the property at issue as the first element of their takings claim and that the Ombudsman's Office has authority to arbitrate the issue. This is not to say that the Ombudsman's Office has authority to resolve all quiet-title disputes between private parties and government entities. The Act does not grant the Ombudsman's Office such broad authority. But here the Selmans have alleged that Box Elder County has *taken* their property, so the authority of the Ombudsman's Office is not being invoked to resolve a quiet-title dispute—the resolution of the issue of title is merely a necessary element of the Selmans' takings claim. And takings claims are within the authority of the Ombudsman's Office.

¶ 24 Accordingly, because the plain language of the Ombudsman Act grants the Ombudsman's Office authority to arbitrate disputes involving takings and eminent domain issues, and because property ownership is a necessary element to all takings and eminent domain claims, we hold that the Ombudsman's Office has authority to determine the issue of property ownership insofar as it relates to the Selmans' takings claim.

---

14. Utah Code Ann. § 13–43–204(1)(a) (2009).

15. *Id.* § 13–43–102(2).

16. *View Condo. Owners Ass'n v. MSICO, L.L.C.,* 2005 UT 91, ¶ 30, 127 P.3d 697 (second and third alterations in original) (quoting *Strawberry Elec. Serv. Dist. v. Spanish Fork City,* 918 P.2d 870, 877 (Utah 1996)).

*B. The Mere Allegation of Property Owner-ship Relating to Takings and Eminent Domain Disputes Is Sufficient to Invoke the Authority of the Ombudsman's Office*

¶ 25 The Ombudsman Act provides that the Ombudsman's Office is authorized to mediate or arbitrate takings and eminent domain disputes "[i]f requested by the *private property owner.*"[17] Box Elder County contends that this language requires that ownership be undisputed before the authority of the Ombudsman's Office may be invoked. We disagree. The plain language of the Ombudsman Act supports the determination that a mere allegation of property ownership in takings and eminent domain disputes is sufficient to invoke the authority of the Ombudsman's Office.

¶ 26 The Act provides,

The Office of the Property Rights Ombudsman shall issue a written statement declining to arbitrate or to appoint an arbitrator when, in the opinion of the Office of the Property Rights Ombudsman:

(i) the issues are not ripe for review;

(ii) assuming the alleged facts are true, no cause of action exists under United States or Utah law;

(iii) *all issues raised are beyond the scope of the Office of the Property Rights Ombudsman's statutory duty to review;* or

(iv) *the arbitration is otherwise not appropriate.*[18]

¶ 27 The language of this provision indicates that there are situations where the Ombudsman's Office may initially accept a case to arbitrate and then later determine that the case involves an area outside the scope of the statutory authority of the Ombudsman's Office. But to make that determination, the Ombudsman's Office must have the authority to receive and hear evidence on matters that might, depending on their resolution, divest the Ombudsman's Office of authority—such as when a party asserting a takings claim does not actually have any interest in the property involved.

¶ 28 Here, the Selmans and Box Elder County both allege ownership of the trail. In addition, the Selmans assert ownership of the property abutting the trail. The Selmans argue that Box Elder County effected a taking when it began road construction activities on the trail and widened the trail by cutting into portions of the Selmans' surrounding property. In contrast, Box Elder County claims that its actions do not constitute a taking because it has always owned the trail. Consequently, if the Ombudsman's Office finds that the Selmans have no protectable interest in either the trail or the abutting property, the plain language of the Act would require the Ombudsman's Office to decline to arbitrate the case because the Selmans could not prevail on a takings claim. We pause to note that, in this case, regardless of who is adjudged to own the trail, takings issues may remain regarding the surrounding property.[19] Therefore, in order to divest the Ombudsman's Office of authority, the Ombudsman's Office must find that the Selmans have no protectable interest in either the trail or the surrounding property. In contrast, if the Ombudsman's Office finds that the Selmans have a protectable interest in either the trail or the abutting property— a necessary determination in their takings claim—the Ombudsman's Office would have the authority to further arbitrate the takings dispute.

---

17. Utah Code Ann. § 13–43–204(1) (emphasis added).

18. Utah Code Ann. § 13–43–204(3)(b) (emphases added).

19. For example, even if Box Elder County is adjudged to own the trail, the Selmans may still assert that the county effected a taking by widening the trail into the Selmans' adjoining property and damaging the watershed. Further, even if the Ombudsman's Office determines that the Selmans own the trail and Box Elder County disclaims any assertion of eminent domain power, a temporary taking may have occurred when Box Elder County removed the gate and widened the trail into the Selmans' adjoining property. *See, e.g., First English Evangelical Lutheran Church of Glendale v. Cnty. of L.A.,* 482 U.S. 304, 321, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) ("[W]here the government's activities have already worked a taking ... no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.").

¶ 29 Box Elder County argues that allowing the Ombudsman's Office to arbitrate the issue of property ownership would be prejudicial because it requires the arbitrator to assume that the Selmans own the trail, thereby creating a presumption in favor of ownership. The county reasons that because the language of the Act states that only a "property owner" can request the assistance of the Ombudsman's Office, allowing the arbitrator to hear the case would indicate his tacit agreement with the Selmans that they have ownership of the trail. We disagree. The situation here is not unlike that which is found in courts of general jurisdiction.

¶ 30 In Utah, merely alleging a claim upon which relief can be granted is sufficient to invoke the jurisdiction of a district court. The law does not require that all facets of the complaint be proven before a district court can hear the issue; rather, mere allegations are sufficient to invoke the court's jurisdiction and initiate litigation. Just as a court of general jurisdiction does not have to tacitly agree that all of the allegations in a complaint are true in order to hear the complaint, the Ombudsman's Office does not have to tacitly agree that the Selmans own the trail in order to arbitrate this matter. Rather, the Ombudsman's Office has authority to arbitrate a takings or eminent domain issue so long as the allegations, if proven, would provide a right to relief.

¶ 31 Accordingly, we hold that the mere allegation of property ownership in a takings or eminent domain dispute is sufficient to invoke the authority of the Ombudsman's Office.

## CONCLUSION

¶ 32 The Ombudsman Act expressly gives the Ombudsman's Office authority to arbitrate disputes involving takings and eminent domain issues. Because property ownership is a necessary element of all takings and eminent domain claims, we hold that the Ombudsman's Office has authority to determine the issue of property ownership as a threshold issue of disputes involving takings and eminent domain claims. Furthermore, we hold that mere allegations of property ownership are sufficient to invoke the author-

ity of the Ombudsman's Office to resolve takings and eminent domain claims. Therefore, the court of appeals erred in affirming the district court's construction of the scope of the arbitration provision of the Ombudsman Act. Accordingly, we reverse the court of appeals' decision and remand with instructions that the district court allow the Ombudsman's Office to proceed with arbitration of the Selmans' takings claim.

¶ 33 Chief Justice DURHAM, Justice PARRISH, Justice NEHRING, and Justice LEE concur in Associate Chief Justice DURRANT'S opinion.