2011 UT 75

**STATE of Utah, in the interest of J.M.S., a person under eighteen years of age.**

**State of Utah, Appellant,**

v.

**J.M.S., Appellee.**

**No. 20091015.**

Supreme Court of Utah.

Dec. 13, 2011.

Mark L. Shurtleff, Att'y Gen., Christopher D. Ballard, Asst. Att'y Gen., for appellant.

Richard L. King, Salt Lake City, for appellee.

On Certification from the Utah Court of Appeals

Chief Justice DURHAM, opinion of the Court:

## INTRODUCTION

¶ 1 We must decide whether the juvenile court erred in concluding that a minor's alleged solicitation of a stranger to punch her and terminate her pregnancy qualifies as an abortion, as the term is defined in the Utah Code. The juvenile court held that an assault of a woman by punching her stomach was a "procedure" intended to terminate her pregnancy and therefore fell within the statutory definition of "abortion." Because a woman cannot be held criminally liable for seeking an abortion, the court dismissed the State's delinquency petition against the minor.

¶ 2 We hold that the solicited assault of a woman to terminate her pregnancy is not a "procedure" as contemplated by statute, and therefore does not constitute an abortion. Accordingly, we reverse the juvenile court's order dismissing the State's petition and remand for further proceedings.

## BACKGROUND

¶ 3 In May 2009, the State filed a delinquency petition in juvenile court alleging that J.M.S., a seventeen-year-old girl, had engaged in criminal solicitation to commit murder, a first degree felony if committed by an adult. According to the State,[1] J.M.S. became pregnant and sought to abort the fetus because her boyfriend threatened to have

nothing to do with her while she was pregnant. J.M.S. visited a Utah clinic to obtain an abortion but was told she was ineligible because her pregnancy was too far advanced.

¶ 4 Approximately thirteen weeks later, J.M.S. approached Aaron Harrison,[2] a stranger, and asked him to help end her pregnancy. The two went to Mr. Harrison's house, having agreed that J.M.S. would pay him to punch her in the stomach to terminate her pregnancy. Mr. Harrison repeatedly punched J.M.S. in the stomach, and she paid him for his participation.

¶ 5 Afterward, J.M.S. called her mother and claimed that someone had sexually assaulted her. J.M.S.'s mother drove her to the police station. During questioning, J.M.S. revealed that she had not been sexually assaulted, but instead had paid Mr. Harrison to hit her to kill her fetus.[3] The attempt to end the pregnancy was unsuccessful, and the child was born relatively healthy.

¶ 6 Before the juvenile court, J.M.S. entered a no-contest admission to criminal solicitation to commit murder, which the State reduced to the equivalent of a second degree felony if committed by an adult. J.M.S. then obtained new counsel and filed a motion to withdraw her admission and to release her from detention. J.M.S. asserted in her motion that her prior court-appointed counsel had simultaneously represented her and the alleged father of her child in separate cases, which raised a conflict of interest. J.M.S. also argued that her prior counsel had provided ineffective assistance because he failed to perform even minimal legal research, did not adequately investigate the case, did not accurately explain to her the consequences of her admission, and spent little time communicating with her prior to her no-contest admission. Moreover, J.M.S. argued that

---

1. The factual basis underlying the State's delinquency petition has not been subject to an evidentiary hearing. We therefore recount the State's version of events solely to assist in our determination of the legal issue presented on appeal.

2. Court documents are inconsistent with respect to the spelling of Mr. Harrison's first name. We employ the spelling as it appears in Mr. Harrison's filings before this court.

3. The State charged Mr. Harrison with attempted murder, a second degree felony. Mr. Harrison pled guilty to that charge, but the trial court convicted and sentenced him for a lesser charge of attempted killing of an unborn child, a third degree felony. The State has appealed Mr. Harrison's sentence to this court. *See, State v. Harrison*, 2011 UT ——.

her prior counsel's failure to research the law applicable to the case resulted in the omission of a critical defense: namely, that a woman cannot be held criminally liable for seeking to obtain an abortion. *See* UTAH CODE ANN. § 76–7–314(1) (Supp.2009).[4]

¶ 7 Without addressing J.M.S.'s claims regarding her prior counsel's alleged conflict of interest and ineffective assistance, the juvenile court granted J.M.S.'s motion to withdraw her admission. In its order, the juvenile court reviewed the statutory definition of "abortion," which "includes any and all procedures undertaken to kill a live unborn child," UTAH CODE ANN. § 76–7–301(1) (2008), and noted that a "procedure" is merely "a series of steps taken to achieve a result." The court therefore reasoned that, assuming the State's allegations were true, J.M.S.'s conduct constituted seeking an abortion, not solicitation of murder. Consequently, J.M.S. could not be held criminally liable under the Utah Code. The juvenile court later granted J.M.S.'s motion to dismiss the State's delinquency petition based on the same grounds.

¶ 8 The State appealed. *See id.* § 78A–6–1109(1) (Supp. 2011) (permitting appeal "from any order, decree, or judgment of the juvenile court"). We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(b).

## STANDARD OF REVIEW

¶ 9 "The interpretation of a statute is a question of law, which we review for correctness." *T–Mobile USA, Inc. v. Utah State Tax Comm'n,* 2011 UT 28, ¶ 9, 254 P.3d 752.

## ANALYSIS

### I. THE TERM "PROCEDURE" IN THE UTAH ABORTION STATUTE REFERS TO MEDICAL PROCEDURES AND DOES NOT EMBRACE THE SOLICITED ASSAULT OF A WOMAN

¶ 10 Under the Utah Code, a pregnant woman cannot be held criminally liable for seeking or obtaining an abortion. *See* UTAH CODE ANN. § 76–7–314(1) (Supp.2009) ("Notwithstanding any other provision of law, a woman who seeks to have or obtains an abortion for herself is not criminally liable."). At the time of the alleged solicited assault, the term "abortion" was defined as "the intentional termination or attempted termination of human pregnancy after implantation of a fertilized ovum, and includes *any and all procedures* undertaken to kill a live unborn child and includes *all procedures* undertaken to produce a miscarriage."[5] *Id.* § 76–7–301(1) (2008) (emphases added). The Utah Code does not, however, define the term "procedure" as it relates to the performance of an abortion.

¶ 11 The State advocates an interpretation of the term "procedure" that is limited to *medical* procedures. It argues that the plain language of the statute supports this interpretation and that it is the only sensible interpretation because a broader reading

---

**4.** The legislature amended certain provisions regarding the practice of abortion in 2009, and these amendments took effect eight days before the alleged assault of J.M.S. *See* 2009 Utah Laws 154. We cite to the provisions of law in effect at the time of the alleged assault. Additionally, the legislature passed House Bill 462 in 2010, which significantly amended statutes related to abortion and criminal homicide. 2010 Utah Laws 149. Where relevant, we note these substantive changes, although they have no bearing on our analysis of the laws in effect at the time of the alleged assault.

**5.** The legislature amended the definition of "abortion" in 2010. 2010 Utah Laws 149. The definition now reads as follows: (1)(a) "Abortion" means:

(i) the intentional termination or attempted termination of human pregnancy after implantation of a fertilized ovum through a *medical procedure* carried out by a physician or through a substance used under the direction of a physician;

(ii) the intentional killing or attempted killing of a live unborn child through a *medical procedure* carried out by a physician or through a substance used under the direction of a physician; or

(iii) the intentional causing or attempted causing of a miscarriage through a *medical procedure* carried out by a physician or through a substance used under the direction of a physician.

UTAH CODE ANN. § 76–7–301(1)(a) (Supp.2011) (emphases added). We restrict our analysis to the version of the abortion definition in effect prior to the 2010 amendments.

would mean that any act, whether humane or heinous, intended to terminate a pregnancy would constitute an abortion. In contrast, J.M.S. urges us to uphold the juvenile court's interpretation. The juvenile court interpreted "procedure" as meaning "a series of steps taken to achieve a result." Under this view, the alleged solicited assault of J.M.S. was a series of steps taken to achieve the termination of her pregnancy and therefore would qualify as an abortion, for which J.M.S. could not be held criminally liable.

¶ 12 We agree with the State that the term "procedure" in the abortion definition is confined to medical procedures. We reach this interpretation for three reasons. First, this interpretation is consistent with the plain language of the abortion definition, given its place in the context of the statutory provisions governing the practice of abortion (the Abortion Statute). Second, adoption of the juvenile court's interpretation of "procedure" would render inoperable a portion of the Utah Code's criminal homicide statute, whereas we seek to avoid statutory interpretations that render related provisions meaningless. Finally, under our doctrine of "absurd results," we deem it inconceivable that the legislature could have intended for any act, of any nature, intended to kill an unborn child to qualify as an abortion. Our interpretation of the abortion definition necessarily excludes the alleged solicited assault of a woman, and we therefore reverse the juvenile court's dismissal of the State's petition against J.M.S.[6]

*A. In Light of the Abortion Statute's Scheme, the Term "Procedure" in the Definition of "Abortion" Refers to Medical Procedures*

¶ 13 Our primary objective in interpreting a statute is to give effect to the intent of the legislature. *Harold Selman, Inc. v. Box Elder Cnty.*, 2011 UT 18, ¶ 18, 251 P.3d 804. To do so, "we look first to [the

statute's] plain language and presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning." *Boyle v. Christensen*, 2011 UT 20, ¶ 27, 251 P.3d 810 (internal quotation marks omitted). Often, "statutory text may not be 'plain' when read in isolation, but may become so in light of its linguistic, structural, and statutory context." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465. For this reason, "our interpretation of a statute requires that each part or section be construed in connection with every other part or section so as to produce a *harmonious whole.*" *Anderson v. Bell*, 2010 UT 47, ¶ 9, 234 P.3d 1147 (internal quotation marks omitted).

¶ 14 The term "procedure," when read in isolation, is capable of multiple interpretations. In a broad sense, the term may mean "[a] specific method or course of action." BLACK'S LAW DICTIONARY 1323 (9th ed. 2009). The term may further be refined to constitute the "traditional, customary, or otherwise established or accepted way of doing things." WEBSTER'S THIRD NEW INT'L DICTIONARY 1807 (1961). These definitions, however, lead to an important question: A "specific method" or "established or accepted way" of doing *what?* What one means by using the term "procedure" depends heavily on context. A court's adherence to procedures, for example, is distinct from a physician's performance of procedures. *Compare MacKay v. Hardy*, 973 P.2d 941, 947 (Utah 1998) ("Our rules of appellate *procedure* clearly set forth the requirements that appellants and appellees *must* meet when submitting briefs before this court." (first emphasis added)), *with Columbia HCA v. Labor Comm'n*, 2011 UT App 210, ¶ 2, 258 P.3d 640 ("In her findings, the ALJ walked through the ten-year chronology of Seely's back problems, listing the major surgeries and *procedures* conducted . . . ." (emphasis added)).

---

**6.** In response to the State's appeal, J.M.S. argued that this court could affirm the juvenile court's order on the alternative bases that J.M.S.'s prior counsel had an "insoluble conflict of interest" and had failed to provide effective assistance. But no evidentiary hearings have been conducted regarding conflict of interest and ineffective assistance of counsel, and the juvenile court's order of dismissal relied solely on its interpretation of the abortion definition. We therefore cannot address the conflict of interest and ineffective assistance of counsel issues. Our opinion does not, however, foreclose J.M.S. from pursuing these claims on remand.

¶ 15 The ordinary and accepted meaning of "procedure" in the definition of "abortion" therefore must be assessed contextually in light of the provisions of the Abortion Statute. Our review of these provisions leads us to conclude that the legislature's use of "procedure" is limited to *medical* procedures. To interpret the term otherwise would require ignoring the clear medical focus of the Abortion Statute and would undermine the harmony of the statute as a whole.

¶ 16 The Abortion Statute repeatedly uses the term "procedure"[7] outside of the definition of "abortion" and in every instance but two, the use of the term relates to the medical context.[8] For example, the Abortion Statute provides that a " '[p]artial birth abortion' does not include the *dilation and evacuation procedure* ..., the *suction curettage procedure,* or the *suction aspiration procedure* for abortion." UTAH CODE ANN. § 76–7–301(3)(b) (2008) (emphases added). After viability of a fetus, "no person may knowingly perform a *saline abortion procedure* unless all other available *abortion procedures* would pose a risk to the life or the health of the pregnant woman." *Id.* § 76–7–310.5(2)(a) (2008) (emphases added). Each of these forms of abortion—dilation and evacuation, suction curettage, suction aspiration, and saline—is a medical procedure conducted by a physician. *See* H.A. HIRSCH ET AL., ATLAS OF GYNECOLOGIC SURGERY 79 (1997). In addition, the Utah Department of Health is charged by statute with publishing printed materials and creating an information video that contain "truthful, nonmisleading descriptions of *abortion procedures* used in current *medical practice* ..., the *medical risks* commonly associated with each *procedure,* ... [and] the consequences of each *procedure* to the fetus at various stages of fetal develop-

ment." *Id.* § 76–7–305.5(1)(c) (Supp. 2009) (emphases added).

¶ 17 In light of these provisions, it is unsurprising that the legislature used the phrase "any and all procedures" in the abortion definition. The Abortion Statute references various abortion procedures available to women. Its definition of "abortion" contemplates "any and all" of these referenced procedures, and likely others. It is unmistakable, however, that every use of the term "procedure" in the Abortion Statute (with the two exceptions noted in footnote 8 relating to court procedures) relates to a medical method of terminating a pregnancy. *See, e.g., id.* § 76–7–305(2)(b)(i)(A) (Supp. 2009) (requiring that medical personnel inform women of materials providing "*medically* accurate information regarding all *abortion procedures* that may be used" (emphases added)).

¶ 18 The juvenile court noted that the phrase "medical procedures" is used in other portions of the Abortion Statute but not in the abortion definition. According to the juvenile court, the legislature therefore "clearly understood the difference and intended the difference" between a "procedure" and a "medical procedure." We disagree.

¶ 19 The Abortion Statute uses "procedures," "medical procedures," and "abortion procedures" interchangeably throughout its provisions; we can discern no intended difference among any of the usages. Where the Abortion Statute employs the phrase "medical procedures," the modifier "medical" is often surplusage. For instance, section 306 of the Abortion Statute provides that, upon objection, "[a] physician, or any other person who is a member of ... a hospital ... shall not be required to participate in the *medical procedures* which will result in the abortion." *Id.* § 76–7–306(1) (2008). The

---

7. Although the abortion definition uses the term "procedures," our analysis encompasses the Abortion Statute's use of the plural and singular form of the term.

8. In our review of the Abortion Statute, we noted only two uses of the term "procedure" that are not tied to the medical context under the provisions' plain language. One is found in a provision regarding hearings for self-consenting minors and provides that a pregnant minor may

circumvent parental consent for an abortion by filing a petition with a juvenile court, and that the Judicial Council shall "establish *procedures* to expedite the hearing and appeal proceedings." UTAH CODE ANN. § 76–7–304.5(6)(d) (2008) (emphasis added). The other provides that "[a]ny funds remaining in the abortion litigation trust account after final appellate *procedures* shall revert to the General Fund." *Id.* § 76–7–317.1(4) (2008) (emphasis added).

adjective "medical" adds no substance to this provision because the section's reference to "physician[s]" and other members of a hospital necessarily limits the term "procedure" to the medical field. *Accord id.* § 76–7–307 (2008) (using "medical procedure" in the context of an act by a physician). We therefore are unable to conclude, as the juvenile court did, that the legislature intended differences among its usage of "procedures," "abortion procedures" and "medical procedures."

¶ 20 Moreover, our conclusion that the abortion definition's use of the term "procedure" is limited to the medical context is all but inescapable given the Abortion Statute's scheme. One can select almost any provision at random and encounter language with a medical context. For example, the four definitions following "abortion" are that of "medical emergency"; "partial birth abortion," which describes specific surgical procedures that do not qualify as partial birth abortions; "physician"; and "hospital." *Id.* § 76–7–301 (2008). Under section 302, an abortion "may be performed ... only by a physician licensed to practice medicine." *Id.* § 76–7–302(2) (Supp. 2009). An abortion also cannot be performed "without the concurrence of the attending physician." *Id.* § 76–7–303 (2008). No abortion may be performed without the woman's "voluntary and informed written consent, consistent with ... the American Medical Association's Code of Medical Ethics." *Id.* § 76–7–305(1) (Supp. 2009). If a physician performs an abortion, any human tissue removed must be submitted to a pathologist. *Id.* § 76–7–309 (2008). In addition, the physician must report to the Department of Health, among other things, the age of the woman, her marital status, "the pathological description of the unborn child," and "the medical procedure used." *Id.* § 76–7–313 (2008).

¶ 21 Given the overwhelming medical focus of the Abortion Statute, we conclude from the plain language of the abortion definition that its use of the term "procedure" refers to medical procedures. This interpretation adheres to the ordinary and accepted meaning of the term "procedure" in the practice of abortion and is consistent with the whole of the Abortion Statute.

**B.  To Interpret "Procedure" to Encompass More than Medical Procedures Would Render Portions of the Criminal Homicide Statute Meaningless**

¶ 22 Under our plain language approach to statutory construction, we interpret the provisions of a statute "in harmony with other statutes in the same chapter and *related chapters.*" *State v. Harker,* 2010 UT 56, ¶ 12, 240 P.3d 780 (emphasis added) (internal quotation marks omitted). "In essence, statute[s] should be construed ... so that no part [or provision] will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another." *State v. Jeffries,* 2009 UT 57, ¶ 9, 217 P.3d 265 (alterations in original) (internal quotation marks omitted). "Therefore, to the extent that conflict exists or arises within statutory language, our duty is to interpret the language, affording each provision a meaningful purpose and separating convoluted statutes with a meaningful distinction." *Id.*

¶ 23 In 1983, the legislature amended the criminal homicide statute to include within the offense the intentional killing of an unborn child. 1983 Utah Laws 437. Under the statute, "[a] person commits criminal homicide if he intentionally ... causes the death of another human being, including an unborn child at any stage of its development." UTAH CODE ANN. § 76–5–201(1)(a) (2008); *see also id.* § 76–5–203(2)(a) (Supp. 2009) ("Criminal homicide constitutes murder if ... the actor intentionally or knowingly causes the death of another"). The statute further provides, however, that "[t]here shall be no cause of action for criminal homicide for the death of an unborn child caused by an *abortion.*" *Id.* § 76–5–201(1)(b) (2008) (emphasis added). Nor, under the Abortion Statute, can a woman be held criminally liable for obtaining an abortion. *Id.* § 76–7–314(1) (Supp.2009). We view the criminal homicide statute and the Abortion Statute as related chapters of the Utah *Code* due to their consideration of criminal liability for abortion. Moreover, we view the Abortion Statute's definition of abortion as integral in interpreting the criminal homicide statute because it is the only

section of the Utah Code defining the practice.[9]

¶ 24 Under the plain language of the criminal homicide statute, the legislature has divided the intentional killing of an unborn child into two categories: those caused by abortions, which are not criminal homicides, *id.* § 76–5–201(1)(b) (2008), and those not caused by abortions, which are criminal homicides. *See id.* §§ 76–5–201(1) (2008), 76–5–203(2)(a), (3)(a) (Supp.2009). Notably, each category includes the mental state of intent to end the life of the unborn child. *See id.* § 76–5–201(1)(a) (2008) (listing intent as a sufficient mental state for criminal homicide); *id.* § 76–7–301(1) (2008) (defining abortion as the "intentional termination ... of human pregnancy"). The actor's mental state is therefore not the distinguishing element between the two categories, leaving the nature of the *act* itself to distinguish an abortion from the intentional criminal homicide of an unborn child. *Cf. State v. Tillman,* 750 P.2d 546, 565 (Utah 1987) (noting the two core requirements of murder, mens rea and actus reus). In other words, for the provisions of the criminal homicide statute to be in harmony, there must be a difference between the *act* of abortion and the *act* of intentional criminal homicide of an unborn child.

¶ 25 The juvenile court's interpretation of the abortion definition, however, eliminates any such distinction. If the broad interpretation of "procedure" as "a series of steps taken to achieve a result" is taken to its logical end, then any act undertaken to intentionally kill an unborn child would constitute an abortion. This result creates a logical conflict within the criminal homicide statute; the legislature cannot have intended to criminalize the intentional killing of an unborn child while simultaneously exempting from prosecution any series of steps intentionally undertaken to kill an unborn child. Such a broad interpretation of "procedure" would thus render meaningless the legislature's designation of the intentional killing of an unborn child as a criminal homicide.

¶ 26 The fact that the juvenile court's interpretation of "procedure" in the abortion definition would render inoperable a provision of the criminal homicide statute reinforces our conclusion that the term "procedure" refers only to medical procedures. This interpretation thus embraces an ordinary, accepted meaning of the term and preserves the integrity of a related statutory provision.

## C. We Decline to Adopt the Juvenile Court's Reading of the Abortion Definition Because It Would Yield Absurd Results

¶ 27 "Where a statute's plain language creates an absurd, unreasonable, or inoperable result, we assume the legislature did not intend that result." *Jeffries,* 2009 UT 57, ¶ 8, 217 P.3d 265. In applying this canon of construction, we have recognized the delicate line between "refraining from blind obedience to the letter of the law that leads to patently absurd ends and avoiding an improper usurpation of legislative power through judicial second guessing of the wisdom of a legislative act." *State ex rel. Z.C.,* 2007 UT 54, 112, 165 P.3d 1206. To help ensure that we do not overstep our bounds and usurp legislative power, we invoke the absurd results doctrine only if a plain language interpretation is so absurd that the "legislature could not possibly have intended" it. *Id.* ¶ 17. To inform this analysis, we often look to whether a particular interpretation would be patently absurd in light of the stated purpose of the statute. *See id.* ¶¶ 15–16.

¶ 28 J.M.S. argues that the most plausible interpretation of "procedure" is "a series of actions conducted in a certain order or manner." New Oxford American Dictionary 1358 (2001). This interpretation is nearly identical to that of the juvenile court, which purportedly based its conclusion on a plain language analysis of the statutory definition of "abortion." However, even assuming that the juvenile court's interpretation follows

9. The current version of the criminal homicide statute further highlights the link between the two statutes, stating, "There shall be no cause of action for criminal homicide for the death of an unborn child caused by an abortion, *as defined in Section 76–7–301* "—the first provision of the Abortion Statute. Utah Code Ann. § 76–5–201(1)(b) (Supp.2011) (emphasis added).

from the plain language of the statute, we still would reject it as working an absurd result that the legislature could not possibly have intended.

¶ 29 Under the broad interpretation adopted by the juvenile court and advocated by J.M.S., any series of actions undertaken to kill an unborn child would be an abortion, including any violent killing of a fetus. One can conceive of countless barbaric scenarios designed to kill an unborn child—including a marksman's carefully placed bullet or even the savage beating of a woman—that the legislature cannot possibly have intended to classify as abortions exempt from criminal liability.

¶ 30 The Abortion Statute's stated purpose of protecting the health of mothers and furthering the rights of unborn children highlights the absurdity of including as an abortion any act of violence intended to kill a fetus. The preamble to the Abortion Statute states that "unborn children have inherent and inalienable rights" that the legislature seeks to protect, and that at times an abortion may be necessary to "save the pregnant woman's life or prevent grave damage to her medical health." UTAH CODE ANN. 76–7–301.1(1), (4) (2008). Before performing an abortion, a physician must assess the pregnant woman's "physical, emotional and psychological health and safety." *Id.* § 76–7–304(2)(a) (2008). Further, "[i]f an abortion is performed when the unborn child is sufficiently developed to have any reasonable possibility of survival outside its mother's womb," the physician must choose the procedure that "will give the unborn child the best chance of survival." *Id.* § 76–7–307 (2008).

¶ 31 It would be absurd to construe the abortion definition as including any series of actions or steps, whether humane or heinous, intended to kill a fetus. Such an interpretation would be at odds with the interest the legislature has expressed in the health of mothers and their unborn children. The Abortion Statute evinces a concern for the safe, humane, and effective practice of medical abortion, placing prohibitions on certain procedures. *See id.* § 76–7–326 (2008) (prohibiting the practice of partial birth abortions). It is therefore unreasonable to con-clude that the legislature would condone the beating of a woman to cause a miscarriage or a sniper's shot intended to kill a fetus but merely wound its mother. Such "procedures" provide no protection of the woman's physical, emotional, or psychological health. They also do not grant the child the best chance of survival outside of the womb.

¶ 32 In sum, were we to accept that the interpretation advocated by J.M.S. and adopted by the juvenile court follows from the statute's plain language, we still would reject that interpretation because it would work an absurd result. We conclude that the legislature could not have possibly intended for the term abortion to include any series of steps or actions undertaken to kill an unborn child, including the alleged solicited violent beating of a pregnant woman.

## CONCLUSION

¶ 33 The Utah Code's definition of abortion contemplates only procedures that are medical in nature. We interpret the definition's use of the term "procedure" in this manner for three independent reasons. First, our interpretation flows from the plain language of the provision and considers the definition's place among the sections of the Abortion Statute. Second, were we to adopt the juvenile court's interpretation, a portion of the Utah Code's criminal homicide statute would be rendered inoperable. Finally, we cannot embrace a broader definition of "procedure" because the legislature cannot possibly have intended for any series of actions or steps undertaken to terminate a pregnancy to qualify as an abortion.

¶ 34 Under the interpretation set forth in this opinion, the alleged solicited beating of a woman to terminate her pregnancy cannot constitute seeking an abortion. We therefore reverse the juvenile court's order dismissing the State's delinquency petition against J.M.S. and remand for further proceedings consistent with this opinion.

Chief Justice DURHAM authored the opinion of the Court, in which Associate Chief Justice DURRANT, Justice PARRISH, and Justice NEHRING joined.

Justice LEE, concurring:

¶ 35 I agree with the court's conclusion that Aaron Harrison's physical assault on J.M.S. was not an abortion "procedure" under Utah Code section 76–7–301(1), but write separately to articulate grounds for that construction that differ somewhat from those embraced by the majority. For me, the salient basis for interpreting "procedure" to encompass medical methods and to exclude a physical assault is in the structural interplay between the abortion statute, Utah Code Ann. § 76–7–314(1)(b)(i) (Supp.2009), and the homicide statute, *id.* § 76–5–201(1)(a) (2008). As the court explains in Part I.B of its opinion, the coexistence of those two statutes clearly indicates that medical abortions are the domain of the abortion statute while nonmedical means of causing death (like an assault) are covered by the homicide statute. *Supra* ¶¶ 24–25. The contrary view advanced by J.M.S. (that all methods of killing an unborn child count as an "abortion") cannot be accepted without "render[ing] meaningless the legislature's designation of the intentional killing of an unborn child as a criminal homicide." *Supra* ¶ 25.

¶ 36 On that point I am in full agreement with the majority and concur in Part I.B of the court's opinion. I find the rest of the court's analysis unnecessary and ultimately unpersuasive, however, and write separately to explain why.

¶ 37 The court's opinion includes two other points in addition to the structural analysis in Part I.B: (a) that the legislature "intended [no] differences among its usage of 'procedures' 'abortion procedures,' and 'medical procedures'" as those terms are used in the abortion statute, *supra* ¶ 19 (Part I.A); and (b) that it would be "absurd" to construe "procedures" to "includ[e] any series of actions or steps, whether humane or heinous, intended to kill a fetus," *supra* ¶ 31 (Part I.C). I do not see either of these points as independent grounds for our holding today.

¶ 38 First, without the inference from the structural interplay between the two different statutes criminalizing the killing of unborn children, there would be no persuasive ground for reading the term "procedure" to mean "medical procedure." I agree with the majority that "[w]hat one means by using the term 'procedure' depends heavily on context." *Supra* ¶ 14. But the context cited by the court in part I.A strikes me as insufficient. As the court acknowledges, the abortion statute's definition employs the term "procedure" without modification or limitation. *Supra* ¶ 10. Without more, the use of the unmodified term "procedure" in the abortion statute suggests that the legislature eschewed the excluded modifier that appears extensively elsewhere in the act. Our cases often treat such internal differences in terminology as intentional.[1] Thus, the face of the abortion statute itself seems only to undermine the view that "the legislature intended [no] differences among its usage of 'procedures,' 'abortion procedures' and 'medical procedures.'" *Supra* ¶ 19.

¶ 39 It may well be true (and is for reasons explained in part I.B in the majority opinion) that the legislature used " 'procedures,' 'medical procedures' and 'abortion procedures' interchangeably throughout its provisions" with "no intended difference among any of the usages." *Supra* ¶ 19. But that conclusion is not evident in the ink on the paper of the abortion statute. Without looking beyond that statute, it would be impossible to tell whether "the modifier 'medical'" was "surplusage," as the majority concludes, *supra* ¶ 19, or intended, as is linguistically possible for reasons described above.

¶ 40 There are means at our disposal to answer the question that the majority raises in Part I.A—whether the "ordinary and accepted meaning of the term 'procedure,'" supra ¶ 21, is limited to medical methods. I have employed such means (corpus linguis-

---

1. *See, e.g., Carrier v. Salt Lake Cnty.*, 2004 UT 98, ¶ 30, 104 P.3d 1208 ("[W]e should give effect to any omission in [a statute's] language by presuming that the omission is purposeful."); *Biddle v. Wash. Terrace City*, 1999 UT 110, ¶ 14, 993 P.2d 875 ("[O]missions in statutory language should 'be taken note of and given effect.' ") (quoting *Kennecott Copper Corp. v. Anderson*, 30 Utah 2d 102, 514 P.2d 217, 219 (1973)); *Field v. Boyer Co.*, 952 P.2d 1078, 1086–87 (Utah 1998) (Stewart, J., concurring in part and dissenting in part) (discussing the *expressio unius* canon of construction).

tics data) before, explaining that an empirical measure of ordinary usage may be appropriate to check our less-than-perfect judicial intuition.[2] In this case, the majority's confident assertion about the "ordinary and accepted meaning" of the term "procedure" in an abortion setting ultimately is based on its intuition—that although "procedure" sometimes signifies any means of accomplishing a result, an "abortion procedure" has reference to a medical procedure. I do not doubt that intuition. (In fact, empirical corpus analysis confirms it.[3]) My quarrel is just that this conclusion follows from our understanding of the word "procedure" in the context of the term "abortion," not from the fact that the statute most often refers to "medical procedures" and not just "procedures."

¶ 41 Second, I disagree with the court's conclusion that our holding follows from our canonical inclination to "refrain[ ] from blind obedience to the letter of the law that leads to patently absurd ends." *Supra* ¶ 27. This strikes me as an incorrect application of a misplaced canon. The absurdity canon is properly invoked where we conclude that a certain construction is so absurd that we are certain that "the legislative body which authored the legislation could not have intended it." *State ex rel. Z.C.*, 2007 UT 54, ¶ 13, 165 P.3d 1206. "But the question in such cases is whether the practical implications of the *plain* text (not a text with two [plausible]

interpretations) are so absurd and ridiculous that we are convinced that the legislature could not have meant what it said." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, 169, 267 P.3d 863 (Lee, J., dissenting). This is not such a case. The statute does not plainly extend to nonmedical abortion procedures, and the question accordingly is not whether to ignore such language on the ground that the legislature "could not have intended it."

¶ 42 We are faced instead with a term ("procedure") of ambiguous meaning that we must interpret in light of its context. That context undoubtedly includes the practical implications of our construction, including, of course, any absurdities. I therefore agree with the majority to the extent it is simply suggesting that practical realities should inform our construction of the abortion statute. But the relevant practical realities are not just ones that are so clearly absurd that they would convince us to override statutory plain language.[4] The relevant question in this case is a broader one—whether the practical implications of one interpretation of "procedure" are sufficiently problematic to undermine a judicial decision attributing that construction to the legislature.

¶ 43 Finally, it seems to me that without the inference from the interplay between the homicide statute and the abortion statute, it

---

**2.** *J.M.W. v. T.I.Z. (In re Adoption of Baby E.Z.)*, 2011 UT 38, ¶¶ 89–105, 266 P.3d 702 (Lee, J., concurring in part and concurring in the judgment).

**3.** In contemporary usage, "abortion procedure" references the termination of a pregnancy under medical conditions, such as in a clinic and under the supervision of a physician. This conclusion is based on a review of every instance in which the words "abortion" and "procedure" co-occur in the Corpus of Contemporary American Usage. *See, The Corpus of Contemporary American English (COCA)*, http://corpus.byu.edu/coca/ (last visited Dec. 1, 2011). Enter "[abortion].[n*]" in the "word(s)" field and "[procedure].[n*]" in the "collocates" field, and select "LIST," then click "search."

This search revealed 223 co-occurrences of "abortion" and "procedure." Of those, 106 referred to specific medical procedures such as dilation and extraction or vacuum aspiration. An additional 75 refer to circumstances in which an abortion is performed in a "clinic" or with a

"doctor" or under "surgical" conditions. The remaining 27 use the terms "abortion" and "procedure" interchangeably. In 5 instances, the term "procedure" and "abortion" were not related. Not once were the terms used to connote an ad hoc, violent, nonmedical effort to terminate a fetus (as by striking the mother's abdomen).

**4.** *Cf. Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶¶ 70, 70 n. 23, 267 P.3d 863, P.3d (Lee, J., dissenting) (suggesting that the "related but separate canon of statutory interpretation" that is implicated where " 'statutory language plausibly presents the court with two alternative readings' " and " 'prefer[s] the reading that avoids absurd results' " is "better understood to suggest that where two [plausible] interpretations present themselves, we consider the practical consequences of each in evaluating which one more reasonably would be understood by a person familiar with the statute in its legal and linguistic context" (quoting *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 73, 210 P.3d 263)).

would not at all "be absurd to construe the 'abortion' definition as including any series of actions or steps, whether humane or heinous, intended to kill a fetus" *Supra* ¶ 31. I certainly agree that the legislature must have meant to impose criminal penalties in the "barbaric scenarios designed to kill an unborn child" imagined by the majority. *Supra* ¶ 29. But the absurdity identified by the majority is rooted not in the abortion statute's definition itself but again in the interplay between the two statutes at issue. Of course the legislature did not mean to "condone the beating of a woman to cause a miscarriage or a sniper's shot intended to kill a fetus but merely wound its mother." *Supra* ¶ 31. But the question before us is not whether such acts are criminal, but whether they fit under the homicide statute or the abortion statute.

¶ 44 For me, the answer to that question is simply and thoroughly established by the structural argument set forth in Part I.B of the court's opinion. I find the discussion in Parts I.A and I.C either unconvincing or entirely dependent on the structural analysis in Part I.B, and I respectfully join only the latter.