Chief Justice DURRANT,
opinion of the Court:
INTRODUCTION
1 1 In 1995, a jury convicted Debra Brown for the murder of Lael Brown. Fourteen years later, in 2009, Ms. Brown filed a petition for a post-conviction determination of factual innocence pursuant to Utah's Post-Conviction Remedies Act (PCRA)[1] The post-conviction court granted Ms. Brown's petition and held an evidentiary hearing. The court interpreted Part 4 of the PCRA to allow its determination of factual innocence to be based on a combination of newly discovered evidence and previously available evidence. It then, based on the evidence Ms. Brown presented at her factual innocence hearing, determined that Ms. Brown established her factual innocence by clear and convincing evidence. It therefore vacated her 1995 murder conviction, and the State appealed.
12 We affirm the post-conviction court. We hold that a post-conviction determination of factual innocence can be based on both newly discovered evidence and previously available evidence. Further, because the State did not properly challenge the post-conviction court's factual findings, we affirm the post-conviction court's ultimate determination that Ms. Brown is factually innocent.
BACKGROUND
13 On Sunday, November 7, 1998, Ms. Brown told police that she discovered her long-time employer Lael Brown (Lael) dead in his bed.[2] Lael had been shot in the head three times. Ms. Brown told police that Lael had been feeling sick and that she had delivered soup to him the day before. She claimed that Lael did not answer his door at the time, so she left the soup on his doorstep. She further claimed that she discovered the soup was still sitting on Lael's doorstep the next day. She stated that when Lael again did not answer his door, she used a key Lael had given her to let herself into his house where she discovered his body.
A. The 1995 Trial
4 On September 9, 1994, police arrested Ms. Brown and charged her with Lael's murder. At Ms. Brown's 1995 trial, the State presented a cireumstantial case that largely depended on Ms. Brown's inability to offer an alibi during the time the State argued Lael must have been murdered. First, the State presented evidence showing no signs of foreed entry into Lael's home. The State *488 claimed Lael always locked his doors and that the front door locked automatically. Further, the State offered evidence that Ms. Brown had access to Lael's house. She had been in his home on previous occasions to clean and paint and had one of only two known keys to Lael's house. The second key belonged to Lael and was found on his key ring.
T5 The evidence at trial also showed that Lael was shot with a .22 caliber handgun. An expert testified that the murder weapon could have been Lael's Colt Woodsman, which was missing from Lael's home after the murder. Testimony indicated that Lael was seen alive Friday evening but was not seen following his usual routine of drinking coffee at Angie's Restaurant on Saturday morning. Lael did not answer his phone on Saturday, and no one saw him working around his house, even though his truck was parked at home. Lael also did not return Saturday to finish repairs for a tenant that he had started the evening before.
T6 The medical examiner, Dr. Grey, testified at trial that, based solely on the physical evidence, Lael was likely murdered between 9:00 p.m. on Saturday, November 6, and 3:00 am. on Sunday, November 7. Dr. Grey also testified that "association factors," like Lael's regular routine and the time he was last seen alive, could expand the time-of-death estimate beyond what the physical evidence suggested. Based on these factors, Dr. Grey agreed that Lael could have been murdered between Friday evening, when Lael was last seen alive, and Sunday morning.
T7 Ms. Brown accounted for her whereabouts during the time Lael could have been murdered, except for a period between 6:40 am. and 10:00 a.m. on Saturday, November 6. At about 6:40 am., Ms. Brown left her then-boyfriend's house after spending the night. And at around 10:00 am., Ms. Brown's son saw her making soup. The State put on evidence that Lael's neighbor, Paulette Nyman, heard two gunshots on Saturday at about 7:00 a.m.
18 Finally, the evidence at trial showed that the only property missing from Lael's home after his murder was his wallet, his .22 caliber Colt Woodsman, his October bank statement, and canceled checks from October and previous months. Copies of the bank statement and canceled checks later showed that several checks were made payable to Ms. Brown, but these checks had apparently been forged.
B. The Appeal
19 A jury convicted Ms. Brown of aggravated murder. In 1996, she appealed her conviction to us. She challenged, among other things, the sufficiency of the evidence the jury relied on to convict her[3] We recognized that there was no direct evidence tying Ms. Brown to the murder and that the State's case against her was entirely circumstantial.[4] We noted that a large part of the State's circumstantial case was Ms. Brown's inability to offer an alibi during the time the State argued Lael must have been murdered.[5] But we also recognized that a jury can base its verdict on sufficient cireumstan-tial evidence.[6] Specifically, we concluded that the jury, based on the evidence available, could have drawn the following reasonable inferences: First, because there were no signs of forced entry, the jury could have inferred that Lael's murderer likely gained access to his house by key and shot Lael while he was asleep in bed.[7] Second, because the medical examiner testified to a time of death between 9:00 p.m. on Friday and 3:00 am. on Sunday and a neighbor testified to hearing gunshots at 7:00 a.m. on Saturday, the jury could have inferred that *489 Lael was murdered at 7:00 a.m. on Saturday.[8]
4 10 Third, because Lael's gun, which was the same caliber as the murder weapon, was missing, the jury could have inferred that the murderer used Lael's gun to shoot Lael.[9] Fourth, because Ms. Brown had been in Lael's home to clean, the jury could have inferred that she knew where Lael kept his gun and financial papers.[10] Fifth, because the only things missing from Lael's house were his wallet, gun, and October bank statement, the murderer likely had a personal interest in that property and, due to her forgeries, the jury could have inferred that Ms. Brown had such an interest.[11] Sixth, Ms. Brown gave inconsistent statements concerning her reason for leaving soup on Lael's doorstep, and the jury could have wondered why, given that she had a key, she did not put the soup inside.[12]
{11 Seventh, the defense could not account for Ms. Brown's whereabouts around 7:00 a.m. when gunshots were heard, but the defense could account for her whereabouts prior to 6:40 am. and after 10:00 am. on Saturday.[13] Finally, because the murderer likely entered by key, and only Lael and Ms. Brown were known to have keys to Lael's house, the jury could have inferred that Ms. Brown was the murderer.[14] Based on these reasonable inferences, we determined that the evidence was sufficient to support Ms. Brown's conviction for Lael's murder.[15]
C. Post-Conviction Proceedings
112 In 2002, the Rocky Mountain Innocence Center (RMIC) began investigating Ms. Brown's conviction. In 2009, based on new evidence that the RMIC believed challenged the State's circumstantial case, Ms. Brown petitioned the post-conviction court for relief. She filed a petition for post-conviction relief under Part 1 of the PCRA and a petition for post-conviction determination of factual innocence under Part 4 of the PCRA.
€13 In her petition under Part 1 of the PCRA, Ms. Brown made five claims for relief[16] The State moved for summary judgment on each of those claims, arguing that summary judgment was proper because Part 1 of the PCRA either foreclosed her requested relief or her claims were untimely under Part I's statute of limitations. Ms. Brown disputed that her claims were time-barred and argued alternatively that the PCRA's statute of limitations is unconstitutional because it does not have an "interests of justice" exception. The post-conviction court ultimately granted the State's motion for summary judgment and found the PCRA's statute of limitations to be constitutional.
{14 Next, in response to Ms. Brown's petition for a post-conviction determination of factual innocence under Part 4 of the PCRA, the State filed a motion to dismiss on May 11, 2009. The post-conviction court denied the State's motion, however, because it found that "a bona fide issue does exist as to whether [Ms. Brown] is factually innocent." After discovery, the post-conviction court held an evidentiary hearing on January 18-24, 2011.
T15 At the January 18-24 hearing, Ms. Brown presented evidence that she characterized as newly discovered. First, she presented evidence "challenging the State's theory that she was the only person who had a motive to kill Lael." This evidence showed that Lael did not discover Ms. Brown's for *490 geries before his murder. It also showed that bank statements from months other than October were missing from Lael's home. Further, the evidence showed that Lael's former tenant, Bobbie Sheen, was angry that Lael had evicted him.
€16 Second, Ms. Brown presented evidence "challenging the State's theory that she was the only person who had access to Lael's home." This evidence showed that people other than Ms. Brown had a key to Lael's house. It also showed that Lael's house was not as secure as previously represented-"the front and back doors to Lael's house were not secure," and "the bathroom window could be opened."
17 Third, Ms. Brown presented evidence that Bobbie Sheen "was the likely perpetrator of the homicide and, therefore, that the State's theory that she was the only possible person who could have committed the murder was erroneous." This evidence showed that police "failed to investigate Sheen even though the police knew he was a possible suspect." It also showed that Sheen may have been in possession of cash and a gun similar to the murder weapon after Lael's death. Further, Ms. Brown presented evidence "that police failed to collect or analyze important evidence at the crime scene."
{18 Finally, Ms. Brown presented evidence challenging the State's theory that Lael's murder occurred at 7:00 a.m. on Saturday, November 6. Paulette Nyman, Lael's neighbor, testified at trial that she heard gunshots Saturday morning. But at the January 18-24 hearing, she testified "that she was not sure when she heard gunshots but that it was on the same day there was police activity at Lael's house, which would have been on Sunday, November 7th."
{19 The post-conviction court concluded that the evidence Ms. Brown presented in the January 18-24 hearing did not establish factual innocence. The court stated that, while her new evidence "raises doubts about the State's cireumstantial case against her," it does "not establish that she did not engage in the conduct for which she was convicted." The court noted that "at best this evidence raises doubts about the State's theory, but it does not affirmatively establish ... that [Ms. Brown] was not the one who entered Lael's home on the morning of November 6th or that she did not, in fact, cause Lael's death."
20 On January 26, 2011, the post-convietion court held a conference call with the parties and indicated a willingness to reopen Ms. Brown's factual innocence case. The court expressed a concern with two pieces of evidence that suggested Lael had been seen alive later in the day on Saturday, November 6. After subsequent investigation by the parties, the court scheduled a second evidentiary hearing for March 7, 2011.
21 Three witnesses testified at the March 7 hearing. First, Lael's friend, Mr. Delwin Hall, testified that he saw Lael at Angie's Restaurant just before Mr. Hall went to work at 2:80 p.m. on Saturday, November 6. Mr. Hall testified that he saw Lael conversing with an unknown man at the counter by the cash register. Mr. Hall stated that he saw Lael's face. Mr. Hall did not want to interrupt so he sat at the other end of the counter without talking to Lael. Mr. Hall also testified that he saw Lael and the other man leave Angie's. Finally, Mr. Hall testified that he gave a statement to a detective at the time of the murder. The detective's case information sheet recorded Mr. Hall's statement as follows:
Del is a friend/coffee drinking buddy of Lael's from Angie's. Dell related that he saw Lael Friday night at Angies and also Saturday, 11-6-98 at approx. 1480 hours in Angies. Dell is sure of the time, because he was stopping in Angie's before going to work at albertson at 1500 hours.
{22 Second, another friend of Lael's, Mr. Terry Carlsen, testified that he saw Lael with his son Mike at Angie's on Saturday, November 6 between 7:15 p.m. and 7:45 p.m. Mr. Carlsen saw Lael and Mike enter the restaurant and sit at the end of the counter. Mr. Carlsen was sure about the time because the next day a friend came to inform him that Lael had been murdered. At that time, Mr. Carlsen remembered thinking that he had just seen Lael the night before. Mr. Carlsen also admitted, however, that Ms. Brown is a friend of his and that he has had some contact with her since her conviction.
*491 123 Third, Lael's son Mike testified for the State. He testified that he saw Lael for the last time on November 1 and that he was not with Lael on Saturday, November 6. The State also offered evidence from police case information sheets "of interviews with waitresses from Angie's Restaurant, all of whom stated that they either did not think Lael was at Angie's on Saturday or that they did not remember or did not recall seeing Lael at Angie's on Saturday."[17]
124 After hearing the evidence at the March 7 hearing, the post-conviction court first determined that, under Part 4 of the PCRA, it could base a determination of factual innocence "either upon newly discovered material evidence alone or a combination of evidence-as long as the newly discovered material evidence provides at least part of that basis." The court then reviewed Mr. Carlsen's testimony and found that it qualified as newly discovered evidence because at the time of trial Ms. Brown and her counsel were unaware of his testimony. The court also found that Mr. Carlsen's testimony was He was good friends with likely accurate. Lael and would not have mistaken Lael for someone else. Also, Mr. Carlsen likely would not have mistaken the day he saw Lael at Angie's given that a friend informed him of Lael's death the very next day. Finally, Mr. Carlsen's testimony was consistent with Dr. Grey's time of death estimate at trial, which, based on the physical evidence at the time of the autopsy, strongly suggested a time of death beginning at 9:00 p.m. Saturday night until 3:00 a.m. on Sunday.
125 The court also found that, although Lael's son Mike testified that he was not with his father at Angie's on Saturday evening and that the last time he saw his father was on Monday, November 1, there were discrepancies in Mike's testimony. He had testified previously that he may have seen his father as late as Thursday and also admitted that he could have had problems with his memory at the time due to alcohol abuse. Thus, the court did not find reason in Mike's testimony to doubt the accuracy of Mr. Carlsen's testimony. The court also found that the waitresses' statements from the case information sheets were not necessarily inconsistent with Mr. Carlsen's testimony. One waitress thought she may have seen Lael on Saturday evening, although she was unsure, and the other waitress stated only that she did not see Lael-she did not state definitively that he was not there.
126 The court's central concern with Mr. Carlsen's testimony, however, was his eredi-bility. He had previously been convicted of tampering with a witness, and his friendship with Ms. Brown may have provided a motive for him to lie. The court also questioned why it took Mr. Carlsen so long to come forward. The court ultimately concluded that Mr. Carlsen's testimony was "not sufficiently credible to independently establish by clear and convincing evidence that Lael was alive at a time when the State argued he must have been dead."
127 Next, the court reviewed Mr. Hall's testimony. It found that his testimony did not qualify as newly discovered evidence because Mr. Hall's name was on a defense witness list at the time of trial. The court recognized, though, that Mr. Hall did not testify at trial and had never testified at any proceeding before the March 7 hearing. The court also found that it was "highly likely" that Mr. Hall testified accurately. And the fact that Mr. Hall gave his statement to a detective on November 10, just days after Mr. Hall claimed to have seen Lael, suggested that Mr. Hall did not mistake the day on which he saw Lael at Angie's. Further, the court found that the waitresses' statements in the case information sheets were not inconsistent with Mr. Hall's testimony. Some of the waitresses were not working at the time Mr. Hall claimed to have seen Lael at Angie's. The other waitresses did not definitively state that Lael was not at Angie's Saturday afternoon.
28 The court found that Dr. Grey's time of death estimate bolstered Mr. Hall's testimony. Dr. Grey testified at trial, and again at the January 18-24 hearing, that based on the physical evidence, Lael died at approximately 9:00 p.m. on Saturday evening. The court also concluded that there was no evi *492 dence suggesting Mr. Hall was not a eredible witness. The only inconsistency in Mr. Hall's testimony was that he originally told the detective that he saw Lael at 2:80 p.m. on Saturday, November 6. But at the March 7 hearing, he testified it would have been closer to 1:00 p.m. The court determined, however, that, given the passage of time, this was not a material inconsistency. The court therefore concluded that Mr. Hall "testified truthfully about what he saw."
D. The Post-Conviction Court's Determination of Factual Innocence
{29 Based on the above evidence and findings, the post-conviction court made two additional findings. First, the court found "by clear and convincing evidence that Lael Brown was alive Saturday afternoon on November 6, 1993." In making this finding, the court relied principally on Mr. Hall's testimony that he saw Lael at Angie's Saturday afternoon. But in keeping with the court's determination that newly discovered evi-denee must provide some basis for its determination of factual innocence, it concluded that Mr. Carlsen's testimony provided "some evidence in support of a finding that Lael was alive Saturday afternoon."
[ 30 Second, the court found "by clear and convincing evidence that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, have been firmly established." In making this finding, the court made three points. First, "no evidence has ever been presented even suggesting that it was [Ms. Brown] who committed the homicide during [a time period other than Saturday morning]." Second, "one of the specific facts set forth by the Utah Supreme Court in its decision on [Ms. Brown's] direct appeal was that she 'could account for her whereabouts for the entire weekend except the hours between 6:40 a.m. and 10:00 a.m. on Saturday, November 6. "
1 31 Finally, the court undertook an "independent assessment of the record" to determine that Ms. Brown's "whereabouts [were] accounted for from 10:00 a.m. Saturday afternoon until Sunday morning at 3:00 a.m." According to the court's account, Ms. Brown's son saw his mother when he awoke around 10:00 a.m. At around 10:20 a.m., Ms. Brown's then-boyfriend, Brent Skabelund, came to take Ms. Brown to her son's basketball game. They left for the game at around 10:45 am. At about 12:15 p.m., Mr. Skabe-lund and Ms. Brown left the game and stopped for lunch at a local drive-in.
1 32 The court further found that Mr. Ska-belund then took Ms. Brown home where she took a nap until about 2:00 p.m. For the next hour or so, Ms. Brown delivered soup to Lael's house, possibly delivered soup to her daughter, and went shopping. She then called Mr. Skabelund at about 4:00 p.m. He again picked her up at about 4:30 p.m., and the two of them went grocery shopping. They returned to Ms. Brown's home at about 5:40 p.m., put away the groceries, and had pizza for dinner.
1383 Finally, the court found that Ms. Brown and Mr. Skabelund remained together at Ms. Brown's house until about 6:45 p.m., when they left to watch movies at Mr. Skabe-lund's residence. Ms. Brown fell asleep while watching a movie at about 8:80 p.m. and slept until about midnight. After she awoke, Ms. Brown drove home where she saw her son playing video games. Ms. Brown then went to bed, and her son indicated that she did not leave the house again that night.
1 34 The court based the above assessment of the evidence in part on Ms. Brown's testimony. The court noted that "the manner in which [she] testified and her demeanor on the witness stand did not suggest that she was lying or simply providing self-serving responses." The court thus found that Ms. Brown "testified truthfully at the evidentiary hearing." The court further noted that while Ms. Brown "may have been alone during a portion of the afternoon on Saturday, no evidence has ever been presented establishing that Lael was killed during [this] time period." Finally, the court recognized that, "despite having denied for years that she stole money from Lael, she candidly admitted that she had ... forged checks belonging to Lael as the State alleged at trial."
*493 1 85 Based on its findings (1) that Lael was alive on Saturday afternoon, November 6 and (2) that Ms. Brown established her whereabouts for the remaining time during which the murder must have occurred, the post-conviction court determined by clear and convincing evidence that Ms. Brown was factually innocent. The court then vacated Ms. Brown's conviction for aggravated murder. The State appealed the post-conviction court's order to us. We have jurisdiction pursuant to section 78A-8-1028)(D) of the Utah Code.
STANDARD OF REVIEW
186 The post-conviction court interpreted Part 4 of the PCRA to allow it to base its determination of factual innocence on a combination of newly discovered evidence and previously available evidence. "We review a district court's interpretation of a statute for correctness." [18]
137 The post-conviction court also concluded that Ms. Brown established her factual innocence by clear and convincing evidence. In making this determination, the post-conviction court made factual findings. "Because a trial court is in a better position . to judgle] credibility and resolv[e] evidentia-ry conflicts, an appellate court reviews the trial court's findings of fact for clear error."[19] We will set aside a district court's factual finding as clearly erroneous only if it is "against the clear weight of the evidence, or if [we] otherwise reach[ ] a definite and firm conviction that a mistake has been made." [20]
ANALYSIS
38 On appeal, the State first argues that the post-conviction court erred in concluding that a determination of factual innocence can be based on a combination of newly discovered evidence and previously available evidence, so long as the newly discovered evidence provides some. of the basis for the determination. Next, the State argues that the post-conviction court erred -in determining that Ms. Brown established her factual innocence by clear and convincing evidence. Ms. Brown cross-appeals and argues that the post-conviction court erred in granting summary judgment on her claims under Part 1 of the PCRA. She also argues that, even if her claims under Part 1 of the PCRA are time-barred, the statute of limitations in the PCRA is unconstitutional.
1389 We affirm the post-conviction court. We first interpret Part 4 of the PCRA and hold that -a post-conviction determination of factual innocence can be based on both newly discovered evidence and previously available evidence. Next, because the State did not properly challenge the post-conviction court's factual findings, we affirm the post-conviction court's ultimate determination that Ms. Brown is factually innocent. We therefore do not reach Ms. Brown's cross-appeal.
I. THE PLAIN LANGUAGE OF THE PCRA ALLOWS A DETERMINATION OF FACTUAL INNOCENCE TO BE BASED ON BOTH PREVI-OoUSLY AVAILABLE EVIDENCE ' AND NEWLY DISCOVERED EVIDENCE
1 40 Part 4 of the PCRA [21] contemplates a two-stage process for establishing factual innocence. Section 78B-9-402 sets forth what a petitioner must do at the first stage to receive an evidentiary hearing on her petition for factual innocence.[22] If the petitioner *494 meets her threshold burden under section 402, a post-conviction court turns to the see-ond stage of the process, which is outlined in section 78B-9-404. That provision sets forth how the evidentiary hearing is to proceed and gives direction to courts on how to determine factual innocence.[23] The parties' arguments on appeal center on what role newly discovered evidence must play in this process.
T41 In its Memorandum Decision, the post-conviction court recognized that the plain language of section 404 does not require a finding of factual innocence to be based on newly discovered evidence. The court determined, however, that given the emphasis on newly discovered evidence at the pleading stage of a factual innocence claim under section 402, "[i]t would be peen-liar if a similar evidentiary basis did not apply during the hearing stage." It thus concluded that "it may base its determination of factual innocence either upon newly discovered evidence alone or a combination of evidence-as long as the newly discovered material evidence provides at least part of that basis."
€{42 The State maintains that the post-conviction court erred when it determined that newly discovered evidence need only provide a part of the basis for a determination of factual innocence. The State argues that, "[when properly read, the PCRA's factual innocence part requires that newly discovered evidence establish factual innocence, not merely play some part in the determination." The State thus contends that the newly discovered evidence must be "the pivotal transformative evidence" in the court's factual innocence determination.
T43 As an initial matter, the State does not dispute that Mr. Carlsen's testimony is "newly discovered evidence," as that term is defined in the PCRA.[24] Due to issues of credibility, however, the court determined that Mr. Carlsen's testimony was entitled only "to some weight" and that his testimony did not "independently establish by clear and convincing evidence that Lael was alive at a time when the State argued he must have been dead." The court found, however, that Mr. Carlsen's testimony, as newly discovered evidence, "constitutes some evidence in support" of its factual innocence finding. The issue for us, therefore, is to determine whether newly discovered evidence must be the "pivotal" or "transformative" evidence in support of factual innocence or whether it need only provide some basis for the court's ultimate decision.
$44 This issue presents a question of statutory interpretation. "Our primary objective in interpreting a statute is to give effect to the intent of the legislature." [25] In so doing, "we look first to its plain language and presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning." [26] Although "statutory text may not be plain when read in isolation, [it] may become so in light of its linguistic, structural, and statutory context." [27] Thus, "our interpretation of a statute requires that each part or section be construed in connection with every other *495 part or section so as to produce a harmonious whole."[28] Finally, "[ilf the language of the statute yields a plain meaning that does not lead to an absurd result, the analysis ends." [29]
T 45 We conclude that the plain language of the PCRA allows a court to base its determination of factual innocence on all available evidence-both old and new. Beginning with stage one, section 402, entitled "Petition for determination of factual innocence-Sufficient allegations-Notification of victim," sets forth threshold requirements a petitioner must meet to receive an evidentiary hearing.[30] Section 402 states that "[the petition shall contain an assertion of factual innocence under oath by the petitioner, and shall aver, with supporting affidavits or other credible documents, that ... newly discovered material evidence exists that, if credible, establishes that the petitioner is factually innocent." [31]
1 46 Section 402 directs the court to view the petitioner's averment of newly discovered evidence "with all the other evidence" to determine whether the petitioner has met the threshold requirements for a hearing.[32] Based on the plain language of section 402, it is clear that, in order to be entitled to an evidentiary hearing, a petitioner must allege that newly discovered evidence exists that establishes factual innocence. And the court, in order to grant the petition for an eviden-tiary hearing, must determine that the newly discovered evidence, when viewed with all the other evidence, demonstrates factual innocence. Accordingly, section 402 requires a threshold showing of newly discovered evi-denee that a petitioner must meet in order to receive an evidentiary hearing.
'I 47 We note that at the petition stage, the court is in no position to assess credibility. Section 402 requires the petitioner to assert factual innocence under oath and to include "supporting affidavits or other credible doeu-ments," but beyond this requirement, the petitioner need only allege newly discovered evidence that-"if credible"-"establishes that the petitioner is factually innocent.[33] * Thus, section 402 limits the court to the content of the petition and requires it to assume the new evidence is credible.
1148 We also note that, even at the petition stage, the plain language of section 402 undercuts the State's argument that newly discovered evidence must be "the pivotal, transformative evidence" in the court's determination of factual innocence. Section 402 explicitly directs the court to view the new evidence "with all the other evidence."[34] Nowhere does it state that the newly discovered evidence alone must be determinative. Therefore, even section 402 contemplates that it will require a combination of new and old evidence to establish factual innocence.
1 49 Once a petitioner makes the threshold showing of newly discovered evidence and the court grants the petition for an evidentia-ry hearing, the petitioner moves to the see-ond stage of the process, which is set forth in section 78B-9-404. Section 404 is entitled "Hearing upon petition-Procedures-Court determination of factual innocence." It places the burden on the petitioner to "establish the petitioner's factual innocence by clear and convincing evidence." [35] In determining whether the petitioner has met the burden of establishing factual innocence, "the court shall consider, in addition to the evidence presented at the hearing under this part, the record of the original criminal case *496 and at any postconviction proceedings in the case."[36]
T 50 Section 404 clearly contemplates that the court will consider the full universe of evidence available in the case. It even provides that "[the court may consider: (a) evidence that was suppressed or would be suppressed at a criminal trial; and (b) hearsay evidence."[37] Importantly, section 404 never uses the phrase "newly discovered evidence." Nor does it provide any direction on how much weight to place on any one type of evidence. Again, nowhere does it state that newly discovered evidence alone must be determinative. Instead, the plain language of section 404 provides only one clear directive: a court shall base its determination of factual innocence on a consideration of "all the evi-denee"-old and new.[38]
51 The State argues, however, that seetion 404 merely establishes what evidence is admissible at the factual innocence hearing. It does not, the State contends, override the requirement in section 402 that newly discovered evidence must establish factual innocence. But section 404's plain language indicates that the legislature intended the section to provide direction to courts on how to determine a claim of factual innocence, not just to set forth what evidence is admissible. For example, it is only by looking to section 404 that we discover the evidentiary standard and a party's burden for establishing a claim of factual innocence.[39] Moreover, the title of section 404 is "Court determination of factual innocence." [40] Therefore, section 404 governs a court's ultimate determination of factual innocence, not section 402.
T52 Common sense supports our conclusions that section 404 controls a court's ultimate determination of factual innocence and that a court may base its determination on all the available evidence. Indeed, it would be strange to direct a court to consider "all the evidence" but then limit its decision to only the pivotal new evidence, especially without giving the court any guidance on how to determine whether a given piece of evidence is, in fact, pivotal. There is no reason to direct a court to "consider" evidence if that evidence cannot play a significant role in the court's ultimate decision.[41] Furthermore, it is not workable to require courts to identify particular evidence as pivotal. A court could be faced with two pieces of evidence: one developed at the original trial and a second at the factual innocence hearing. Either one alone could be meaningless, but both taken together could be significant. We therefore decline the State's invitation to require courts to base their decisions exclusively on newly discovered pivotal or transformative evidence.
T 53 Finally, the State contends that "Jf a factual innocence determination could be based on previously presented evidence, a post-conviction court could improperly substitute its judgment for the jury's." As discussed above, however, the State concedes that Mr. Carlsen's testimony is newly discovered evidence. Thus, we are not faced with the issue of whether a court could base its decision of factual innocence solely on previously available evidence. We recognize only that, under the plain language of the PCRA, previously available evidence can play a significant role in the court's ultimate decision of factual innocence. Because this plain reading of the statute is in no way unreasonable, our analysis ends.[42] But we are also confident that the high threshold showing of new evidence in section 402, when strictly applied,[43] will ensure that newly discovered *497 evidence plays a role in a court's determination of factual innocence under section 404.
154 We therefore hold that, under the plain language of the PCRA, the post-conviction court did not err in concluding that a determination of factual innocence can be based on a combination of newly discovered evidence and previously available evidence.
II. BECAUSE THE STATE FAILED TO PROPERLY CHALLENGE THE POST-CONVICTION COURTS FACTUAL FINDINGS, WE AFFIRM THE COURTS DETERMINATION OF FACTUAL INNOCENCE
155 After the March 7 hearing, the post-conviction court made two critical factual findings in reaching its ultimate determination of factual innocence. First, the court found "by clear and convincing evidence that Lael Brown was alive Saturday afternoon on November 6, 19983." Second, the court found "by clear and convincing evidence that [Ms. Brown's] whereabouts from Saturday afternoon on November 6th to the early morning hours of Sunday, November 7th, have been firmly established." Based on these two findings, the court "determine[d] by clear and convincing evidence that [Ms. Brown] did not engage in the conduct for which she was convicted and is, therefore, factually innocent of the aggravated murder of Lael Brown."
156 The State contends that the post-conviction court misapplied the standard for factual innocence. The State argues that "a reasonable juror could hear all of [Ms. Brown's] evidence, including [Mr.] Hall's testimony, and still find [Ms. Brown] guilty." This, the State claims, is because "the post-conviction court's conclusion ... is not the only reasonable conclusion to be drawn from the evidence. A juror could reasonably weigh the evidence differently." Specifically, the State argues that (1) evidence exists that contradicts Hall's testimony; (2) while Brown's motive to murder Lael was disputed at trial, she now admits to forging Lael's checks; and (8) it is possible that Ms. Brown murdered Lael at a time other than Saturday morning. Therefore, the State maintains that Ms. Brown failed to demonstrate by clear and convincing evidence that she did not engage in the conduct for which she was charged.
157 The State also argues that our deferential clear error standard of review does not apply to the post-conviction court's ultimate determination of factual innocence. In so arguing, it concedes that it "is not challenging any of the post-conviction court's factual findings." The State instead contends that the ultimate determination of factual innocence is a mixed question of fact and law and that, once we apply this standard, the post-conviction court's determination deserves little, if any, deference.
158 We conclude that, while the ultimate determination of factual innocence may be a mixed question of fact and law, this point is inconsequential in light of the State's explicit acknowledgment that the post-convietion court's factual findings are accurate. Because the State declined to challenge the court's factual findings as clearly erroneous, we accept the findings as true and therefore must conclude that Ms. Brown has established her factual innocence. We therefore affirm the post-conviction court.
159 We have stated that "[sItandards of review should allocate discretion between the trial and appellate courts in a way that takes account of the relative capabilities of each level of the court system." [44] "[AJn appellate court reviews a trial court's conclusions of law for correctness because a single trial judge is in an inferior position to determine what the legal content of [a legal concept] should be." [45] Conversely, "[blecause a trial court is in a better position to judg[le] eredi-bility and resolve] evidentiary conflicts, an appellate court reviews the trial court's findings of fact for clear error.[46]
*498 T 60 In this case, the post-conviction court made two findings that were purely factual: (1) Lael was alive Saturday afternoon on November 6, and (2) Ms. Brown firmly established her whereabouts between Saturday afternoon and the remaining time the murder could have occurred[47] Furthermore, the court reached these findings only after judging credibility and resolving evidentiary conflicts. For example, the court weighed Mr. Carlsen's credibility, found that Mr. Hall testified truthfully, and specifically considered "the manner in which [Ms. Brown] testified and her demeanor on the witness stand." The court also discounted the testimony of Lael's son, Mike, due to admitted memory problems and placed less weight on hearsay evidence offered by the State. And the court considered and discounted the State's evidence suggesting a time of death earlier than 9:00 p.m. on Saturday, November 6. Because the court's findings are purely factual and based on credibility judgments and resolutions of evidentiary conflicts, we apply the deferential clear error standard on appeal.
T 61 Yet the State declines to undertake a clear error analysis on this appeal "because [it] is not challenging any of the post-conviction court's factual findings." [State's Reply Brief, 16 (emphasis added).] Thus, the State has explicitly acknowledged that it does not challenge any of the post-conviction court's factual findings. Chief among these are that (1) Lael was alive as of Saturday afternoon; and (2) Ms. Brown firmly established her whereabouts during the period in which Lael must have been murdered. While the State admits these two central facts, it nevertheless argues that the application of these facts to the legal standard for establishing factual innocence constitutes a mixed question of fact and law.
T 62 Given this concession, the State's position on this issue is confusing. On the one hand, the State clearly concedes the post-conviction court's factual findings that Lael was alive Saturday afternoon and that Ms. Brown firmly established her whereabouts for the remaining time period during which the murder could have occurred. But on the other hand, the State attacks the underlying evidence on which the court relied in making these factual findings by exhaustively listing other credible evidence that would allow a juror to still find Ms. Brown guilty.[48]
1 63 In offering these two inconsistent positions, the State appears to mistake findings of fact with evidence. We readily recognize the existence of evidence in this case that calls into question the post-conviction court's factual findings. And we agree with the State that the court's ultimate decision of factual innocence "is not the only reasonable conclusion to be drawn from the evidence." [State's Brief, 49.] But in light of the State's concession that the court's factual findings are accurate, the mere existence of contradictory, underlying evidence is of no consequence. It is precisely because the court had to judge credibility and resolve conflicting evidence that we now grant deference to its factual findings. In our court system, district courts are better positioned to make *499 these findings.[49] We therefore decline, as an appellate court, to serutinize the post-convietion court's factual findings where the State has explicitly acknowledged their accuracy.
T64 Given our conclusion relating to the State's concession, there is no merit to the State's claim that the post-conviction court misapplied the standard for factual innocence. It is true that the post-conviction court ultimately applied a legal concept. This concept required Ms. Brown to show by clear and convincing evidence that she did not "engage in the conduct for which [she] was convicted." [50] But it is nevertheless true that the post-conviction court found that Lael must have been murdered at a time when Ms. Brown had an established alibi. Once these facts are accepted, as they must be in light of the State's concession, they lead inevitably to the conclusion that Ms. Brown did not murder Lael and is factually innocent.
T 65 The dissent criticizes our reliance on the State's concession, however, as overly broad and unfair[51] It argues that in the context of the overall briefing, the State meant to concede only "pure" facts, not "hybrid" facts-a distinction the dissent admits is invalid.[52] The dissent contends that the two critical findings discussed above regarding the time of Lael's death and Ms. Brown's whereabouts were challenged by the State on appeal as "hybrid" facts and thus do not fall within the State's concession.[53] The dissent would therefore review the post-conviction court's factual findings under a clear error standard and reverse.[54] While the dissent presents an analysis that is thoughtful and worthy of careful consideration, we respectfully disagree with it for a number of reasons.
T 66 First, the way in which the State has briefed its case is wholly consistent with its explicit concession that it is not challenging the post-conviction court's factual findings. It makes no attempt to meet its burden on appeal to demonstrate that the factual findings-whether "pure" or "hybrid'-are clearly erroneous.[55] The State instead openly insists that a clear error analysis is unnee-essary, which can only be true, of course, if the facts are not at issue. Moreover, the State does not even purport to marshal the evidence.[56] It merely, though exhaustively, lists the evidence it claims contradicts the evidence relied on by the post-conviction court in making its finding of factual innocence.[57] But it makes no effort to assume the role of devil's advocate and marshal the evidence in support of the court's factual findings,[58] which, again, is consistent with its assertion that it is not challenging the court's factual findings.
T67 This is not a case where a party is simply unaware of its burden on appeal. Indeed, the State repeatedly cites the correct standard, including the duty to marshal the evidence, to us in its briefing. [State's Brief, *500 2; State's Reply Brief, 13-14.] Whether or not the State's failure to argue clear error was grounded on a distinction between "hybrid" and "pure" facts, it remains the case that the State, based on its concession, failed to carry its burden on appeal.[59] Thus, we conclude that the overall context of the State's briefing supports our decision in this case.[60]
T 68 Second, we disagree with the dissent's construction of the State's concession as running only to so-called "pure" facts.[61] Any confusion as to the seope of the concession was cleared up by the State itself when it *501 stated, immediately after its concession, that it "challenges only the court's legal conclusions based on its factual findings." [State's Reply Brief, 16 (emphasis added).] This statement clearly concedes all factual findings, whether "pure" or "hybrid," by placing only the post-conviction court's "legal conclusions" at issue on appeal. Surely the State did not mistakenly assume the court's key factual findings as to the time of Lael's death and Ms. Brown's whereabouts to be legal conclusions.[62]
169 Although the State has declined to challenge the post-conviction court's factual findings for clear error, the dissent has done so in an able and vigorous way.[63] While we do not reach this issue given our reliance on the State's concession, we nevertheless express disagreement with how the dissent has approached its analysis. The dissent proposes that, by "pure" factual findings, the State simply meant findings as to witness credibility at the post-conviction hearings; and that, by "hybrid" findings, the State meant those findings implicating evidence from the first trial.[64] Both Mr. Hall and Ms. Brown testified for the first time at the post-conviction hearings,[65] and the court made specific credibility findings as to each.[66] Thus, these findings would presumably qualify as unchallenged "pure" facts under the dissent's approach. The dissent seems to disregard, however, the post-conviction court's credibility findings in its clear error analysis. Instead, the dissent repeatedly dismisses Ms. Brown's account of her whereabouts as "subjective" and "self-serving" without acknowledging the unchallenged finding that Ms. Brown testified credibly.[67] So even if we were to accept the dissent's hypothesis that the State's concession runs only to so-called "pure" facts, we would still have to address the difficult question of how the post-conviction court's determination is clearly erroneous when it is conceded to be based on credible evidence.[68]
*502 T70 Regardless of whether Ms. Brown's alibi is the "weakest [the dissent has] heard of" [69] the mere fact that an alibi is self-serving (they always are) or that it is offered by a boyfriend or a son does not make it somehow inherently incredible as a matter of law. The post-conviction court's decision in this case was based on a weighing of evidence and is laced with credibility findings.[70] We are not deciding this case in the first instance and should not presume that we are more capable of analyzing eredibility.[71] Our role as an appellate court is to assess whether there has been clear error as to the post-conviction court's factual findings.[72] We have been presented with no such argument and therefore affirm.
CONCLUSION
T71 We affirm the post-conviction court. We hold that a post-conviction determination of factual innocence can be based on both newly discovered evidence and previously available evidence. Also, because the State did not properly challenge the post-conviction court's factual findings, we affirm the post-conviction court's ultimate determination that Ms. Brown is factually innocent.
Chief Justice DURRANT authored the opinion of the Court, in which Associate Chief Justice NEHRING, Justice DURHAM, and Justice PARRISH joined.
Justice LEE filed a dissenting opinion.

. Ms. Brown also asserted claims for post-conviction relief under Part 1 of the PCRA. The State moved for summary judgment on those claims, and the post-conviction court granted the State's motion. Ms. Brown filed a cross-appeal to us challenging the court's grant of summary judgment. Because we affirm the post-conviction court's determination of Ms. Brown's factual innocence, we do not reach Ms. Brown's cross-appeal.

. Lael Brown and Debra Brown are not related.

. State v. Brown (Brown I), 948 P.2d 337, 340 (Utah 1997).

. Id. at 344.

. See id. at 339-40 (noting that "[oJn the basis of a neighbor's statement about hearing gunshots, police thought the murder occurred at approximately 7:00 a.m. on Saturday, November 6, 1993. {[Ms. Brown] could account for her whereabouts for the entire weekend except the hours between 6:40 a.m. and 10 a.m. on Saturday, November 6").

. Id. at 344.

. Id. at 345.

. Id. at 345-46.

. Id. at 346.

. Id.

. Id.

. Id.

. Id.

. Id.

. Id.

. First, she claimed that newly discovered evidence establishes her factual innocence. Second, she claimed that newly discovered evidence establishes that no reasonable juror could have found her guilty of Lael's murder. Third, she claimed her conviction violated due process due to an inadequate police investigation. Fourth, she claimed her conviction violated due process because police withheld exculpatory evidence. Finally, she claimed her trial and appellate counsel provided ineffective assistance.

. The waitresses did not testify at the March 7 hearing.

. H.U.F. v. W.P.W., 2009 UT 10, ¶ 19, 203 P.3d 943.

. State v. Levin, 2006 UT 50, ¶ 20, 144 P.3d 1096 (alterations in original) (internal quotation marks omitted).

. State v. Walker, 743 P.2d 191, 193 (Utah 1987).

. Ms., Brown filed her petition for factual innocence in 2009, but the parties and the post-conviction court have all relied on the 2010 version of the PCRA up to this point in the proceedings. The 2010 amendments did not materially alter the language at issue in this case. So to maintain consistency, we also rely on the 2010 version unless otherwise noted.

. See Urag Cope § 78B-9-402 (stating that "[a] person ... may petition the district court ... for a hearing to establish that the person is factually innocent" and setting forth the threshold requirements). We stress that the sufficiency of Ms. Brown's petition is not at issue on this appeal. We consider section 402 only to place section *494 404 in proper context. But given that Ms. Brown did not include the evidence provided by Mr. Carlsen and Mr. Hall in her petition for factual innocence, there is a question whether her petition should have been granted in this case. As the post-conviction court noted, however, the State never challenged whether Ms. Brown's evidentiary hearing should go forward.

. See generally id. § 78B-9-404.

. See id. § 78B-9-401.5(3) (" 'Newly discovered material evidence' means evidence that was not available to the petitioner at trial or during the resolution on the merits by the trial court of any motion to withdraw a guilty plea or motion for new trial and which is relevant to the determination of the issue of factual innocence. ..."). Ms. Brown disputes the post-conviction court's determination that Mr. Hall's testimony is not newly discovered evidence. Because the State agrees, however, that Mr. Carlsen's testimony is newly discovered, and because we affirm the post-conviction court's conclusion that a determination of factual innocence can be based on a combination of old and new evidence, we do not reach this argument.

. State v. J.M.S. (In re J.M.S.), 2011 UT 75, ¶ 13, 280 P.3d 410.

. Boyle v. Christensen, 2011 UT 20, ¶ 27, 251 P.3d 810 (internal quotation marks omitted).

. Olsen v. Eagle Mountain City, 2011 UT 10, ¶ 9, 248 P.3d 465 (internal quotation marks omitted).

. Anderson v. Bell, 2010 UT 47, ¶ 9, 234 P.3d 1147 (internal quotation marks omitted).

. Carranza v. United States, 2011 UT 80, ¶ 8, 267 P.3d 912.

. See Urax Cope § 78B-9-402(1) ("A person ... may petition the district court ... for a hearing to establish that the person is factually innocent...."}.

. Id. § 78B-9-402(2)(a). The newly discovered material evidence must also "establish[] innocence" and be more than "impeachment evidence" or "cumulative of evidence that was known." Id. § 78B-9-402(2)(a)Gi)-(iv).

. Id. § 78B-9-402(2)(a)(v), -402(2)(b) (emphasis added).

. Id. § 78B-9-402(2)(a)(i).

. Id. § 78B-9-402(2)(a)(v).

. Id. § 78B-9-404(1)(b).

. Id. § 78B-9-404(3) (emphasis added).

. Id. § 78B-9-404(2).

. Id. § 78B-9-404(4).

 See id. § 78B-9-404(1)(b), (4) (providing that "[the burden is upon the peutloner to establish the petitioner's factual innocence" and directing the court to determine factual innocence by "clear and convincing evidence").

. Id. § 78B-9-404.

. See WeestEr's Ninte New Corpecrate Dictionary 279 (1988) (defining "consider" as "to think about carefully," especially "with regard to taking some action").

. Carranza, 2011 UT 80, ¶ 8, 267 P.3d 912; LPI Servs. v. McGee, 2009 UT 41, ¶ 11, 215 P.3d 135.

. See supra ¶ 40 n. 22.

. State v. Levin, 2006 UT 50, ¶ 19, 144 P.3d 1096 (internal quotation marks omitted).

. Id. ¶ 20 (second alteration in original) (internal quotation marks omitted).

. Id. (second and third alterations in original) (internal quotation marks omitted).

. See State v. Pena, 869 P.2d 932, 935 (Utah 1994) ("Factual questions are generally regarded as entailing the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind.").

. For example, the State points out that (1) "[nlone of the waitresses who worked at Angie's on that Saturday recalled seeing Lael that day"; (2) "[the man that [Mr.] Hall allegedly saw with Lael has never come forward to confirm that he was with Lacl on that Saturday afternoon"; (3) "Lael did not answer numerous phone calls from his granddaughter and ex-wife on Saturday, even though his ex-wife routinely called on Saturday mornings"; (4) "Lael's truck was in his driveway from at least 10:00 am. to 4:30 pm."; (5) "Lael's neighbor ... was outside during that time and never saw Lael come or go or follow his usual practice of puttering around his yard"; (6) "Lael never returned on Saturday to complete the plumbing repairs, despite his promise to do so"; (7) Lael never picked up Ms. Brown's soup, so he would have had to step over it twice on his way to and from Angie's Restaurant if Mr. Hall's testimony was accurate; (8) it is still undisputed that Ms. Brown had access to Lael's house; (9) Ms. Brown now admits to forging Lael's checks; (10) Ms. Brown's son's testimony at trial that he saw Lael write a check to his mother is now false; (11) there is evidence that Lael discovered Ms. Brown's forgeries before his death; (12) the missing bank records from Lael's house still implicate only Ms. Brown; and (13) Ms. Brown still could have committed the murder later in the day on Saturday, November 6. [State's Brief, 48-54.]

. Levin, 2006 UT 50, ¶ 20, 144 P.3d 1096.

. Urag Cope § 78B-9-401.5(2)(a) (defining factual innocence); see also Greener v. Greener, 116 Utah 571, 212 P.2d 194, 204 (1949) (stating that clear and convincing evidence "carries with it, not only the power to persuade the mind as to the probable truth or correctness of the fact it purports to prove, but has the element of clinching such truth or correctness").

. Infra ¶¶ 77-178.

. Infra ¶¶ 94-95, 99.

. Infra ¶ 95.

. Infra ¶ 19.

. See In re Estate of Bartell, 776 P.2d 885, 886 (Utah 1989) (discussing a party's burden when challenging a factual finding).

. We stress that we do not "fault the State for a failure to marshal" the evidence. Infra ¶ 101. We merely note that its failure to do so is consistent with its position that it is not challenging the post-conviction court's factual findings on appeal.

. Supra ¶ 62 & n. 49.

. See United Park City Mines Co. v. Stichting Mayflower Mountain Fonds, 2006 UT 35, ¶ 26, 140 P.3d 1200. The dissent recommends that we "abandon this principle" of requiring parties to assume the role of devil's advocate when marshaling the evidence. Infra ¶ 106. But regardless of any merit that argument may have going forward, for purposes of this case, our marshaling standard unquestionably governs any challenge by the State of factual findings on appeal, and the State is, of course, well aware of that requirement. [State's Reply Brief, 14.]

. See In re Estate of Bartell, 776 P.2d at 886 (stating that the court must "rely heavily on the presumption of correctness that attends [factual] findings" when a party fails to carry its burden to demonstrate clear error). The dissent acknowledges that the State has failed to present a clear error analysis. See infra ¶ 111 (''The State should ... have framed [its]} argument in terms of the applicable standard of appellate review. It should have asserted that there was 'clear error' in not concluding that Ms. Brown had failed to remove all 'serious or substantial doubt' as to her factual innocence."). It nevertheless deems this a "rhetorical deficiency" and concludes that the State "effectively challenges" the post-conviction court's factual findings "on that basis." Infra ¶¶ 100, 108. The dissent thus characterizes the State's approach in a way the State itself has expressly rejected.
The State's claim that the clear error standard does not apply on appeal was in direct response to Ms. Brown's application of the clear error standard in her brief. [See Brown's Brief, 42; State's Reply Brief, 15.] Ms. Brown analyzed each of the post-conviction court's factual findings, including the two key findings regarding Lael's time of death and Ms. Brown's whereabouts, using a clear error analysis. [Brown's Brief, 42-48.] In so doing, Ms. Brown explicitly pointed out that the State had employed the wrong standard of review-a "reasonable juror" standard-for challenging factual findings in its opening brief. [Brown's Brief, 47.] One would expect, therefore, that if the State is indeed challenging the facts, as the dissent maintains it is, it would have disputed Ms. Brown's contention that it applied the wrong standard of review. But instead, the State concedes in its reply brief that it is not challenging the facts. [State's Reply Brief, 16]. Thus, in attempting to excuse the State's "rhetorical deficiency," the dissent ignores the explanation the State itself gives for its approach: it means only to argue that the court erred in its application of the factual innocence standard, even accepting the court's factual findings. [State's Brief, 47-491; see also supra ¶ 56.

. We therefore disagree with the dissent that we are misconstruing a "single" sentence in the State's overall briefing. See infra ¶¶ 72, 79. As the dissent recognizes, the concession appears in a section of the State's reply brief in which it contests Ms. Brown's application of the clear error standard of review. Infra ¶ 89. The full paragraph in which the State conceded the post-conviction court's factual findings reads as follows:
Applicable standard of review. [Ms. Brown] first argues that the applicable standard of review is clear error. But that standard applies only when a court reviews purely factual questions. The clear error standard does not apply in this case, because the State is not challenging any of the post-conviction court's factual findings. Rather, the State challenges only the court's legal conclusions based on its factual findings.
[State's Reply Brief, 15-16.] It is difficult to see how the State could have stated more clearly that it is not challenging the underlying factual findings in this case. And, as discussed above, the State briefed its argument consistent with this concession by not engaging in a clear error analysis.
We also disagree that the State's arguments in its reply brief or elsewhere diminish or clarify the scope of its concession. Infra ¶¶ 91-92. We openly recognize that the State presents us with evidence that contradicts the post-conviction court's factual findings. See supra ¶¶ 62-63 & n. 49. But we believe the dissent misapprehends the State's apparent tactic in doing so. The State is not-as it concedes-seeking to overturn the court's factual findings under a clear error analysis. -It instead attempts to show that, in light of the contradictory evidence, the court erred in concluding that the factual innocence standard had been met, even accepting the unchallenged factual findings. [State's Brief, 47-49.] This is because, according to the State, "a reasonable juror" could disagree with the court, [State's Brief, 48], or the court's decision "is not the only reasonable conclusion" given the evidence, [State's Brief, 49].
The "confusion" we expressed on this point earlier in this opinion, supra ¶ 62, does not relate to the scope of the State's concession, as the dissent seems to suggest, see infra 188. Rather, we were simply expressing confusion as to why the State would undertake such a strategy. See supra ¶¶ 63-64. At this juncture in the process, it is not our role to determine what a reasonable juror would conclude as to the facts or whether there are other reasonable factual conclusions in light of the evidence. Our role is limited: we decide only whether the court committed clear error in making the factual findings that it made. Levin, 2006 UT 50, ¶ 20, 144 P.3d 1096; see also Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 580-81, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

. Infra ¶ 98.

. But see infra ¶ 90 (arguing that "liln context, it is impossible to read {the State's concession] fairly to encompass the 'key' determinations of the timing of Mr. Brown's death and the whereabouts of Ms. Brown").

. Infra ¶¶ 119-28. But see In re Estate of Bartell, 776 P.2d at 886 (recognizing that "the burden of overturning factual findings is a heavy one, reflective of the fact that we do not sit to retry cases submitted on disputed facts" (emphasis added)).

. Infra ¶¶ 89-90.

. Supra ¶¶ 21, 34.

. Supra ¶¶ 27, 34.

. Infra ¶¶ 126, 127. We do not mean to suggest that the court's credibility findings could not be found to be clearly erroneous if properly challenged. But the State, as the dissent recognizes, concedes their accuracy. Their accuracy is therefore not at issue in this case.

. See 438 Main St. v. Easy Heat, Inc., 2004 UT 72, ¶¶ 72-73, 99 P.3d 801 (stating that district court's factual finding was not clearly erroneous, even in light of "plausible evidence" to the contrary, where it was based on credible evidence); see also Anderson, 470 U.S. at 575, 105 S.Ct. 1504 (noting that factual findings "based on determinations regarding the credibility of witnesses" are afforded "even greater deference ... for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said").
The dissent also argues that the post-conviction court clearly erred, even accepting its credibility findings, because Ms. Brown's "account of her whereabouts ... does not at all rule herself out as Lael Brown's murderer." Infra ¶ 115. This is because "even according to Ms. Brown's own evidence, she was at the scene of the crime at a time when the murder may have been committed." Infra ¶114.
Even were we to reach this issue, which we do not, we think there is a serious question as to whether the court clearly erred in this regard. The evidence is not at all clear that Ms. Brown's account of her whereabouts placed her at the scene of the crime at a time the murder was committed. She certainly does admit, however, to taking soup to Lael's house on Saturday, November 6. According to the court's account of the record, she delivered the soup sometime between 2:00 p.m. and 3:00 p.m. Mr. Hall originally stated that he saw Lael alive at 2:30 p.m. but then testified at the factual innocence hearing that it was closer to 1:00 p.m. Thus, depending on how we view the evidence, there is at least a very narrow window, 2:30 p.m. to 3:00 p.m., and at most an hour window, 2:00 p.m. to 3:00 p.m., during which Ms. Brown placed herself at Lael's house at a time when Lael might possibly have been there. We therefore agree with the dissent that there is potentially some room to doubt the court's finding that Ms. Brown firmly established her whereabouts, even accepting the court's credibility findings.
But the clear and convincing evidence standard, by its very nature, tolerates some doubt. *502 We have stated that "a burden of proof is an expression of society's tolerance for error in a particular realm of the law." Essential Botanical Farms, LC v. Kay, 2011 UT 71, ¶ 21, 270 P.3d 430. Clear and convincing evidence is an "intermediate standard of proof" that "implies something more than the usual requirement of a preponderance ... of the evidence; and something less than proof beyond a reasonable doubt." Id. ¶¶ 21, 24 (internal quotation marks omitted). We have characterized this standard as requiring the "existence of facts that make a conclusion very highly probable." Id. ¶24 (internal quotation marks omitted).
Under this standard, and given the unchal lenged credibility findings, it is not a foregone conclusion that the court clearly erred in determining that Ms. Brown established her whereabouts. The State has never presented any evidence that the murder occurred during the relevant hour of 2:00 p.m. to 3:00 p.m. Further, the court specifically recognized that Ms. Brown "may have been alone during a portion of the afternoon on Saturday" but discounted this fact because "evidence was presented suggesting that Lael was not killed during this time frame." Specifically, Lael's neighbor, Kimberly Standridge, testified at trial that she did not hear any gunshots Saturday afternoon and that, if there were any, she would have heard them because she was working in her yard during the relevant time. The court also relied on Dr. Grey's time of death estimate based on the physical evidence, which "strongly suggest[ed] that Lael was likely killed around 9:00 p.m.," not Saturday afternoon. In our view, given this contrary evidence, the question is still open as to whether the court clearly erred in discounting the doubt identified by the dissent.

. Infra ¶ 75.

. Supra ¶ 60.

. See, e.g., Anderson, 470 U.S. at 574, 105 S.Ct. 1504 ("The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise.").

. Levin, 2006 UT 50, ¶ 20, 144 P.3d 1096; see also Anderson, 470 U.S. at 580-81, 105 S.Ct. 1504 (recognizing the limited role of appellate courts when reviewing factual findings under a clear error standard).