**2021 UT App 52**

## THE UTAH COURT OF APPEALS

JLPR LLC,
Petitioner,

*v.*

PROCUREMENT POLICY BOARD, DEPARTMENT OF AGRICULTURE AND
FOOD, AND DIVISION OF PURCHASING AND GENERAL SERVICES,
Respondents.

Opinion
No. 20190798-CA
Filed May 13, 2021

Original Proceeding in this Court

Jason M. Kerr and Steven W. Garff,
Attorneys for Petitioner

Sean D. Reyes, Paul H. Tonks, and Brent Burnett,
Attorneys for Respondents

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGE
JILL M. POHLMAN and SENIOR JUDGE KATE APPLEBY concurred.[1]

HARRIS, Judge:

¶1　After a law was passed legalizing medical marijuana in
Utah, the Utah Department of Agriculture and Food (UDAF)
invited applications for a limited number of medical cannabis
cultivator licenses. JLPR LLC (JLPR) applied for one of the
licenses, but UDAF awarded the licenses to others. JLPR
appealed UDAF's decision first to a protest officer (Officer), and
next to the Utah Procurement Policy Board (Board), each of
which rejected JLPR's appeal. JLPR now seeks judicial review of
the Board's decision, and after review we decline to disturb it.

---

1. Senior Judge Kate Appleby sat by special assignment as
authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

BACKGROUND

¶2     In November 2018, Utah voters approved a citizen initiative legalizing medical marijuana. In a special legislative session held just a few weeks after the election, the Utah Legislature "replaced the initiative with its own statute." *See Grant v. Herbert*, 2019 UT 42, ¶ 1, 449 P.3d 122. The new law, known as the Utah Medical Cannabis Act (the Act), included details for implementing a medical marijuana market in Utah. *See* Act of Dec. 3, 2018, ch. 1, §§ 1–141, 2018 Utah Laws 3rd Spec. Sess. 3, 3–89. The Act authorized UDAF to issue as many as ten licenses to businesses wishing "to operate a cannabis cultivation facility." *See* Utah Code Ann. § 4-41a-205(1) (LexisNexis Supp. 2019). As originally enacted, the Act also provided that the process of awarding licenses would be governed by the Utah Procurement Code, *id.* § 4-41a-201(2)(a), and that UDAF's "authority to issue a license under this section [was] plenary and . . . not subject to review," other than as provided in the procurement code, *id.* § 4-41a-201(12).

¶3     At some point in late May or early June 2019, UDAF issued a Request for Proposals (RFP) seeking applications from vendors interested in obtaining a medical cannabis business license. If applicants demonstrated that they met certain threshold requirements set forth in the Act, *see id.* § 4-41a-201(2)(b), they advanced to a "technical criteria evaluation stage" in which they were evaluated by a six-member UDAF evaluation committee (Committee) based on additional criteria. These additional criteria are also set forth in the Act, and include an applicant's business experience, the soundness of its "operating plan," an applicant's "positive connections to the local community," and its demonstrated ability to "reduce the cost [of the product] to patients." *See id.* § 4-41a-205(3). Applications were due by July 1, 2019.

¶4 When the RFP was first released, it indicated that each applicant needed to be "a resident of the State of Utah." But in late June 2019, shortly before the July 1 deadline, UDAF changed that requirement and indicated that it would accept applications from individuals and entities that were not Utah residents.

¶5 JLPR is a Utah-based limited liability company with four members, all of whom are Utah residents. JLPR was aware of the initial requirement that license applicants be Utah residents, and asserts that it "carefully structured" the formation of its entity "around this requirement." JLPR's four members collectively had "over 150 years of successful business experience and expertise" in various endeavors, including "a large brine shrimp operation on the Great Salt Lake," a "large scale ranching" operation in south-central Utah, a "Utah based railroad," and other "restaurant and hospitality businesses in Utah." JLPR purported to be financially sound, with "significant earned capital" and the ability to "fully self-finance all cannabis operations," including cultivation. On or about July 1, 2019, JLPR submitted a timely application for one of the available cannabis business licenses.

¶6 Over the ensuing weeks, the Committee analyzed the eighty-one applications that had been timely submitted, including JLPR's. Three of the applications were rejected for failing to meet the minimum statutory requirements, and an additional forty-five of them failed to "meet the required minimum technical scores" as outlined in the RFP. The remaining thirty-three applications that met all minimum thresholds, including JLPR's, were then evaluated more closely by the Committee, which met to "discuss[]" those applications and to "determine who was the most qualified based on the contents of their submission as outlined in [the] RFP." The Committee conducted its evaluation entirely on the applicants' written submissions; it did not provide applicants the

opportunity to interview with or otherwise appear in person before the Committee.

¶7    On July 19, 2019, UDAF announced that it had awarded cannabis licenses to eight businesses, four of which were Utah-based businesses and four of which were not. JLPR was not chosen to receive a license. According to UDAF's "Award Justification Statement," "[t]he proposals with the highest total scores received the awards," and JLPR did not have one of the eight highest total scores.

¶8    JLPR appealed the denial of its application by filing a "formal protest" letter with the Officer, according to the requirements set forth in the procurement code. *See* Utah Code Ann. § 63G-6a-1602(1), (2) (LexisNexis Supp. 2019). In its three-page protest letter, which was submitted without any attachments or exhibits, JLPR challenged UDAF's decision on four grounds. First, it took aim at the RFP process itself, asserting that it was "rushed and incomplete," and had therefore been "unduly restrictive" and "anticompetitive." In particular, it criticized UDAF for allowing applicants "less than a month" to submit "complete application[s]," and for not conducting "interviews, phone calls or other methods" whereby the Committee "could really get to know the applicants." And it complained about the criteria change "at the very end of the process" that allowed non-residents to apply. Second, JLPR claimed that there had been "bias" on the part of the Committee, although the only bias it identified was a "bias toward out-of-state applicants." Third, it alleged that UDAF had failed to "correctly apply or calculate the scoring criteria," and asserted that this was evidenced by "[s]coring inconsistencies" among the six members of the Committee. Finally, it claimed that the Committee made "[e]rrors," asserting generally that JLPR was "the ideal candidate" for a cannabis license and should have received more points than those who were ultimately awarded licenses. As its requested remedy, JLPR asked "to schedule a

mutually convenient time to discuss its scores and the unique abilities and qualifications of its members" and "to provide supplement[al] information."

¶9     Less than a week later, after reviewing JLPR's protest letter, the RFP, the "contents of the solicitation file," and various statutory provisions and administrative rules, the Officer rejected JLPR's protest. He dismissed JLPR's challenge to the particulars of the RFP process on timeliness grounds, determining that, under the procurement code, any challenges to the bid process must be filed prior to the application deadline. (Citing *id.* § 63G-6a-1602(2).) And he dismissed the remainder of JLPR's challenges for lack of evidence. Specifically, he determined that JLPR failed to provide "any facts or evidence that demonstrate a bias." He also determined that JLPR had not submitted any evidence of scoring inconsistencies, noting that "it is common for evaluators to not have the exact same score for each criterion because of their independent judgment." And he determined that, under the procurement code, "a protestor cannot claim it should have received more points or a competitor should have received fewer points." (Citing Utah Admin. Code R33-16-101a.)

¶10     One week after that, JLPR appealed the Officer's decision to the Board. JLPR's initial submission to the Board was a four-page letter similar to the one it had previously submitted to the Officer; in the letter, it made the same four arguments, and again did not attach any exhibits or other evidence. Just over a month later, after learning the identities of the three Board members appointed to the administrative appeals panel, JLPR submitted a second letter addressed to those members individually, again without attachments or exhibits. In this second appeal letter, JLPR again touted its business experience and connection to the community, and asserted that it should have been awarded a license. This time, however, JLPR noted that, since the licenses had been awarded, it had "engaged in initial and somewhat

considerable due diligence into each of the permitted licensees," and hinted that it had found "significant conflicts of interest and political ties" that it believed had "driven many if not all of the selection outcomes," and asserted that "the selection process was based upon who you are and who you know rather than if you are truly capable and qualified" to run a cannabis business. But JLPR provided no specific information to support these allegations, stating merely that it was "prepared if needed to disclose all the information [it had] discovered thus far."[2] And once again, JLPR indicated that its requested remedy was "a meeting with the appropriate decision maker(s), including, but not limited to . . . the Lieutenant Governor, the Governor, Bi-Partisan State Senators, Representatives, Legislators, Oversight Committees and the Attorney General to discuss [its] qualifications" for a cannabis license. At the end of the letter, JLPR indicated that it had blind-copied the letter to unnamed "[p]otential [i]nterested [p]arties" who in its "opinion [could] and [would] add value to an amicable resolution" of the matter.

¶11 After determining that a hearing was "unnecessary," the Board sustained the Officer's decision. In a three-page written ruling, the Board determined that JLPR had "failed to provide any facts or evidence in support of its claims," and therefore concluded that the Officer's decision "was not arbitrary and capricious" or clearly erroneous.

---

2. As noted below, *see infra* note 8, the only specific piece of new information in this regard that JLPR included in its second letter was a statement that it had learned that one member of the Board's appeals panel was an attorney at a law firm that represented one of the successful licensees. But JLPR did not request any specific action as a result of this discovery; it did not, for instance, ask the Board member in question to recuse himself.

¶12    JLPR now seeks judicial review of the Board's decision. In its briefs submitted to this court, JLPR continues to press the same issues it raised with the Officer and the Board. But in addition to those issues, JLPR attempts to raise a number of new issues that it did not bring to the attention of the Officer or the Board. After filing its petition for review with this court, JLPR made several public records requests, pursuant to Utah's Government Records Access and Management Act (GRAMA), *see generally* Utah Code Ann. § 63G-2-201 (Supp. 2019), seeking documents associated with the cannabis license bid process. In addition, JLPR became aware of an audit report (Audit Report), released in 2020, in which the Utah State Auditor's Office described the conclusions it had reached following an inspection of UDAF. JLPR's appellate briefs were accompanied by seventeen attachments; almost none of the information contained in these attachments was in the administrative record submitted to the Officer and to the Board. Included in the attachments are emails among UDAF employees, and between UDAF employees and cannabis license applicants; an affidavit from an investigator; redacted versions of some of the successful awardees' applications; news articles regarding some of the successful awardees; and a full copy of the Audit Report.

¶13    These attachments, according to JLPR, provide evidence to support its allegations that the bid process was flawed and that the decisionmakers were biased and had conflicts of interest. For instance, some of the emails indicated that UDAF employees informally met with some of the applicants during the open application period. Another document was a sworn declaration containing assertions that one of the successful licensees hired the former deputy commissioner of UDAF—who left UDAF in May 2019, just days before the application period opened—and paid him a six-figure contingent fee to help the company obtain a license. And the Audit Report expressed "concerns about certain factors and conditions" relating to the entire bid process "that call into question the independence of

the process." In particular, the Audit Report highlighted a possible "[l]ack of [s]coring [i]ndependence" among the members of the Committee, as well as questionable scoring "adjustments . . . made to the raw score[s] of" all but the highest-ranking Committee members. The Audit Report noted that such scoring idiosyncrasies "are considered unusual and could indicate an attempt by senior management to influence other [Committee] members." In the end, the Audit Report recommended that UDAF "[i]mplement blind evaluations" and "reassess the licenses awarded."

## ISSUES AND STANDARDS OF REVIEW

¶14 Two issues require our attention in this petition for review. First, we must determine whether we are able to consider the new materials JLPR has attached to its briefs and which were not part of the protest appeal record before the Officer and the Board. Because this issue arises for the first time here on review, our decision is not governed by any standard of review, and we decide the matter as a question of law in the first instance. *Cf. Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (stating that when an issue is raised for the first time on appeal, "there is no lower court ruling to review" and we must decide the question in the first instance as a matter of law).

¶15 Second, we address the merits of the Board's decision to dismiss JLPR's protest. In this context, we will disturb the Board's decision only if it was "arbitrary and capricious or clearly erroneous." Utah Code Ann. § 63G-6a-1802(4)(c) (LexisNexis 2019). An agency's decision is arbitrary and capricious only if "it is not supported by substantial evidence in the record." *See Staker v. Town of Springdale*, 2020 UT App 174, ¶ 24, 481 P.3d 1044 (quotation simplified); *see also Bradley v. Payson City Corp.*, 2003 UT 16, ¶¶ 10, 23, 70 P.3d 47. And a decision is supported by substantial evidence if—after "consider[ing] all the evidence in the record, both favorable and

contrary"—we determine that "a reasonable mind could reach the same conclusion" as the administrative decisionmaker. *See Staker*, 2020 UT App 174, ¶ 24 (quotation simplified). Similarly, we will not consider the Board's decision to be clearly erroneous unless it conflicts with the record evidence or we are firmly convinced that "a mistake has been made."[3] *See Brown v. State*, 2013 UT 42, ¶ 37, 308 P.3d 486 (quotation simplified). JLPR bears the burden of demonstrating entitlement to relief in this court. *See* Utah Code Ann. § 63G-6a-1602(4) (Supp. 2019); *see also Salt Lake City Corp. v. Jordan River Restoration Network*, 2018 UT 62, ¶ 59, 435 P.3d 179 ("In general, the law has long assigned the burden of proof to the petitioner, plaintiff, or appellant.").

ANALYSIS

I

¶16 Before turning to the merits of JLPR's petition for review, we must first determine whether we can consider the new materials that JLPR attached to its briefs but which were not part of the administrative record or submitted to the Officer or the Board. For the reasons set forth, we determine that we cannot consider those materials in the context of this petition.

---

3. The term "clearly erroneous," as used in Utah Code section 63G-6a-1802(4)(c) (LexisNexis 2019), is not defined by statute and, as far as we are aware, has not been separately defined by Utah appellate courts in the administrative context. Accordingly, we employ the definition of that term as it is applied in other civil and criminal appeals. *See, e.g., Brady v. Park*, 2019 UT 16, ¶ 72, 445 P.3d 395 (applying clear error to civil court factual findings); *Brown v. State*, 2013 UT 42, ¶ 37, 308 P.3d 486 (applying "clear error" to criminal post-conviction court's factual findings); *State ex rel. Z.D.*, 2006 UT 54, ¶ 40, 147 P.3d 401 (applying "clear error" to juvenile court factual findings).

¶17    Utah's procurement code—which governs JLPR's petition for review[4]—allows a losing applicant for a state contract to challenge a denial by filing a protest with a designated protest officer. *See* Utah Code Ann. § 63G-6a-1602(1) (LexisNexis 2019). Such a protest must include "a concise statement of the facts and evidence . . . providing the grounds for the . . . protest," and "may not be considered unless it includes facts and evidence" establishing one of the statutory grounds for a protest. *Id.* § 63G-6a-1602(4)(a), (b).

¶18    If a protest officer denies a protest, an applicant may appeal that decision to the Board; upon the filing of an appeal, the applicant's "protest appeal record" is transmitted to the Board. *See id.* § 63G-6a-1702(2)(a), (5)(a). The "protest appeal record," by statutory definition, consists of the following items: the protest officer's decision; "all documentation and other evidence the protest officer relied upon in reaching the protest officer's decision";[5] if the protest officer held a hearing, a

---

4. As noted, at the time of JLPR's application for a cannabis license, the process was governed by Utah's procurement code. *See* Utah Code Ann. § 4-41a-201(2)(a) (LexisNexis Supp. 2019). However, a subsequent statutory change made clear that future cannabis license applications are not to be governed by the procurement code. *See id.* § 4-41a-201(2)(a)(i) (Supp. 2021).

5. It is worth noting that the universe of materials considered by the Officer in reviewing JLPR's protest is not necessarily—and, indeed, is almost certainly not—the same as the universe of materials considered by the Committee in selecting the eight awardees. Contrary to JLPR's implications, it was neither the Officer's nor the Board's burden, during the protest process, to seek out materials that might have been considered by the Committee; rather, it was JLPR's burden to bring materials

(continued…)

recording of that hearing; "a copy of the [applicant's] written protest"; and "all documentation and other evidence submitted" by the applicant. *Id.* §§ 63G-6a-1601.5(3), -1701.5(2). Notably, applicants may not base their arguments to the Board on any "new or additional evidence not considered by the protest officer," and the Board "may not . . . take any additional evidence." *Id.* § 63G-6a-1702(3)(b), (6)(b). Indeed, in appeals where the protest officer held no hearing, the Board's decision must be based solely on "the notice of appeal and the protest appeal record." *Id.* § 63G-6a-1702(7)(a).

¶19    Finally, if the applicant receives an adverse decision from the Board, the applicant may petition for review in this court. *Id.* § 63G-6a-1802(1)(b). By statutory mandate, we review such petitions "as an appellate court" and "may not hear the matter as a trial de novo." *Id.* § 63G-6a-1802(4)(a), (b). "An appellate court's review is limited to the evidence contained in the record on appeal." *State v. MacNeill*, 2016 UT App 177, ¶ 41, 380 P.3d 60 (quotation simplified). And this is true even in instances where we are asked to review an administrative agency's decision. *See Oliver v. Utah Labor Comm'n*, 2017 UT 39, ¶ 57, 424 P.3d 22 ("In appeals from formal administrative adjudications, reviewing courts are limited to the administrative record before them."); *see also In re Anderson*, 2004 UT 7, ¶ 47, 82 P.3d 1134 (explaining that we "review [administrative] actions as an appeal" and "never take additional evidence" because "matters that may be dispositive" must "be presented in the first instance to the agency, so that it may consider them at the time of reaching its decision," and stating that "[f]ailure to do so . . . is usually a bar to later consideration"). In administrative appeals, our appellate rules define the record on appeal as "all papers in the agency

---

(…continued)
supporting its protest to the Officer's attention. *See id.* § 63G-6a-1602(4) (LexisNexis 2019).

file." *See* Utah R. App. P. 11(d)(3). In the context of this case, that includes the "protest appeal record" transmitted from the Officer to the Board, all documents or memoranda submitted by the parties to the Board, and a copy of the Board's decision. *See* Utah Code Ann. §§ 63G-6a-1601.5(3), -1701.5(2).

¶20    If a lower court or administrative agency neglects to include matters in the record on appeal that should have been included, litigants may seek to supplement the record on appeal. *See* Utah R. App. P. 11(h). But parties may not simply attach new documents to their appellate briefs without first obtaining permission to supplement the record on appeal. *See State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279 ("[A]lthough the record may be supplemented if anything material is omitted, it may not be done by simply including the omitted material in the party's addendum."); *see also Olson v. Park-Craig-Olson, Inc.*, 815 P.2d 1356, 1359 (Utah Ct. App. 1991) (explaining that rule 11 "establishes a procedure for supplementing the record" but the rule is not a means "to introduce new material into the record").

¶21    When JLPR submitted its initial protest letter, it did not include exhibits or attachments supporting its arguments, despite bearing the burden to provide facts and evidence supporting its claims. *See* Utah Code Ann. § 63G-6a-1602(4). As a result, the "protest appeal record" transmitted to the Board when JLPR mounted its administrative appeal did not contain most of the materials JLPR now attaches to its appellate briefs; instead, the "protest appeal record" contained only JLPR's three-page protest letter and the Officer's decision.[6] *See id.* §§ 63G-6a-

---

6. The "protest appeal record" transmitted to the Board should have included the "contents of the solicitation file" that the Officer reviewed in reaching his decision. Indeed, at oral argument before this court, UDAF acknowledged as much. But

(continued…)

1601.5(3), -1702(7). And, as noted, the Board is statutorily forbidden from considering materials outside the "protest appeal record." *See id.* § 63G-6a-1702(7). In the end, the entire administrative record submitted to this court as the record on appeal consists of just twenty-nine pages: JLPR's initial protest letter, the Officer's decision, JLPR's two appeal letters to the Board, and the Board's decision.

¶22   While acknowledging that most of the exhibits attached to its appellate briefs are not part of the "official record," JLPR nevertheless asks us to review the new materials on the ground that they were "not available and could not have been discovered prior to the appeal deadline," and it faults UDAF for failing to include these new materials "in its self-created record." But the record we may consider on review is strictly limited to the materials considered by the Officer and the Board. *See id.* §§ 63G-6a-1702(3)(b), (6)(b), (7), -1701.5(2), -1802; *see also* Utah R. App. P. 11(d)(3). That record consists of the twenty-nine pages

---

(…continued)

JLPR did not file a motion to supplement the record to add the "contents of the solicitation file," and therefore our knowledge of what was in that file is limited. At oral argument, UDAF agreed that, at a minimum, that file would have included a copy of UDAF's Award Justification Statement, the document setting forth the identity of the eight successful applicants and all the applicants' relative scores. Given this concession, we consider the Award Justification Statement—attached as Addendum F to JLPR's opening brief—to be part of the record on appeal, and a document that we may properly consider. But given the lack of any formal motion to supplement the record, we have no reason to believe that the Officer or the Board considered any of the other new documents attached to JLPR's briefs; as discussed herein, those documents are not part of the record on appeal and we may not consider them.

submitted to us by the agency, and the one document that UDAF now agrees should have been included in that record but was not. *See supra* note 6. We are thus limited in our review to the matters included in that record. *See MacNeill*, 2016 UT App 177, ¶ 41 (stating that our "review is limited to evidence contained in the record on appeal" (quotation simplified)).

¶23    Accordingly, apart from the one exception noted, the new materials attached to JLPR's briefs are not part of the record on appeal, and we are not permitted to consider them in our review of the Board's decision.

II

¶24    Without those materials, JLPR cannot carry its burden of demonstrating that the Board's decision was arbitrary and capricious or clearly erroneous. The procurement code provides six grounds upon which a protestor may object to an agency's decision, provided there exists "facts and evidence" to support the objections. *See* Utah Code Ann. § 63G-6a-1602(4)(b). JLPR raised four of these grounds in its protest, and we address each in turn.[7]

---

7. JLPR also attempts to raise new issues that were not argued before the Officer or the Board and that are based on the new materials not part of the record on appeal. Such issues are unpreserved for our review. *See Salt Lake City Corp. v. Jordan River Restoration Network*, 2018 UT 62, ¶ 37, 435 P.3d 179 ("Issues not raised in proceedings before administrative agencies are not subject to judicial review except in exceptional circumstances." (quotation simplified)). And JLPR has not persuaded us that any of the exceptions to our preservation doctrines apply here. *See generally State v. Johnson*, 2017 UT 76, ¶¶ 19–39, 416 P.3d 443 (recognizing and clarifying the three "exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional

(continued…)

¶25 First, JLPR raised certain complaints about the structure of the RFP process. *See id.* § 63G-6a-1602(4)(b)(vi) (allowing applicants to protest where "specifications in a solicitation are unduly restrictive or unduly anticompetitive"). In particular, JLPR asserted that the application process was "extremely rushed" and that late changes made to the requirements regarding eligibility of out-of-state applicants "created confusion" and "did not provide adequate time for applicants to adapt." The Officer dismissed these complaints as untimely, citing section 63G-6a-1602(2) of the Utah Code and offering his view that, under the procurement code, "a person may not protest the procurement process after the deadline for submitting responses to solicitation." The Board affirmed the Officer's decision. Before this court, JLPR does not engage with the reasoning of the Officer and the Board, and offers no argument that dismissal of its first set of complaints on untimeliness grounds was improper. Accordingly, JLPR has not carried its burden of appellate persuasion on this point, and we decline to disturb the Board's decision on this basis alone, without offering any opinion as to the correctness of the timeliness ruling on its merits. *See Allen v. Allen*, 2021 UT App 20, ¶ 35, 483 P.3d 730 (declining to address an issue on the merits because the petitioner had "left the [lower] court's basis for its decision unaddressed" and therefore "ha[d] not carried his burden to show error" regarding that decision).

¶26 Second, JLPR claimed that the Committee exhibited "bias toward out-of-state applicants." *See* Utah Code Ann. § 63G-6a-1602(4)(b)(iv) (allowing applicants to protest where there exists "a bias exercised by an evaluation committee or an individual committee member, excluding a bias that is a preference arising

---

(…continued)
circumstances"). Accordingly, we limit our review to the four grounds JLPR raised in its original protest.

during the evaluation process because of how well a solicitation response meets criteria in the solicitation"). In support, JLPR pointed to the fact that "4 of the 8 (50%) out-of-state applicants received a license," while "only 4 of the 73 (.05%) [sic] in-state applicants received a license." In its letter to the Board, JLPR stated that it "does not believe that members of the [Committee] were personally or intentionally biased,"[8] but offered its view that a bias in favor of out-of-state applicants was "inherent in the [s]olicitation process" after UDAF altered the requirements midstream. As an initial matter, to the extent this complaint goes to the structure of the solicitation process itself, it fails for the reason just stated. *See supra* ¶ 25. Moreover, the Officer and the Board rejected this claim on its merits for lack of evidence, and JLPR has not demonstrated that the Board's decision was arbitrary and capricious, or clearly erroneous, based on the record before the Board. The numerical data regarding the identities of the winning applicants was the sole piece of evidence JLPR offered in support of its bias claim, and that data alone cannot sustain a valid claim of bias. As JLPR acknowledges, given that medical marijuana was illegal in Utah prior to 2018, many of the out-of-state applicants had more relevant business experience than the in-state applicants. There could have been any number of valid reasons why UDAF

---

8. In its second letter to the Board, JLPR noted, as though in passing, that one of the members of the Board's appeals panel was employed by a law firm that also represented one of the winning applicants. JLPR referred to that issue as "a minor example" of a "conflict[] of interest" but did not assert that the Board member in question was biased as a result, and did not ask that Board member to recuse himself. More to the point, the Board member in question was not a member of the Committee; at no point during the administrative proceedings before the Officer or the Board did JLPR accuse any member of the Committee of being specifically or individually biased.

selected a higher percentage of the out-of-state applicants than the in-state applicants, and to the extent any "bias" was based on the criteria set forth in the RFP (for example, business experience), it would not have been improper. *See* Utah Code Ann. § 63G-6a-1602(4)(b)(iv) (stating that a valid protest for bias cannot be grounded in a complaint that there was "a preference" for "how well a solicitation response meets criteria in the solicitation"). In short, based on the materials submitted to the Board, we cannot say that its decision to reject JLPR's claim of bias was arbitrary and capricious, or clearly erroneous.

¶27    Third, JLPR complained that the "scoring criteria w[ere] not applied correctly or consistently." *See id.* § 63G-6a-1602(4)(b)(v) (allowing applicants to protest where there is "a failure to correctly apply or calculate a scoring criterion"). But the only evidence JLPR offered in support of this contention was that the evaluators' individual scores varied a great deal from one another.[9] As the Officer correctly explained, Utah's administrative code requires Committee members "to exercise independent judgment in a manner that is not dependent on anyone else's opinions or wishes." *See* Utah Admin. Code R33-7-705(1)(a). We agree with the Officer's assessment that, in the course of the Committee's work, "it is common for evaluators to not have the exact same score for each criterion because of their independent judgment." Variable scoring is expected and not per se improper. Thus, the presence of variable scoring among the six members of the Committee does not, on its own, show

---

9. After reviewing the Audit Report, which found evidence of the opposite problem—that evaluators had changed their scores to bring them more into line with UDAF senior management—JLPR changed tack on this issue. After initially arguing, in its first brief filed with this court, that the scores were "inconsistent," JLPR argued in its reply brief that the Committee members' scoring had not been variable enough.

impropriety. Because JLPR supported this third claim with no other evidence, the Board's decision to dismiss it was not arbitrary and capricious, or clearly erroneous.

¶28 Finally, JLPR claimed that all of the identified errors and infirmities in the process caused the Committee to give JLPR too low a score and some of its competitors too high a score. *See* Utah Code Ann. § 63G-6a-1602(4)(b)(iii) (allowing an applicant to protest "an error made by an evaluation committee"). The Officer dismissed this claim based on administrative rules that disallow protests based on "vague or unsubstantiated claims or allegations" that "the protestor should have received a higher score" or that "another vendor should have received a lower score." *See* Utah Admin. Code R33-16-101a(2)(c)(ii)(A), (B). The Board affirmed the dismissal, and JLPR does not engage with the reasoning of either the Officer or the Board. Accordingly, JLPR has not demonstrated that the administrative dismissal of this claim was arbitrary and capricious, or clearly erroneous.

## CONCLUSION

¶29 In evaluating the Board's decision to dismiss JLPR's protest, we are limited in our review to the record on appeal: the materials submitted to and considered by the Officer and the Board in rendering the administrative decision at issue. JLPR's attempt to attach to its briefs new material not contained in the administrative record was improper, and we may not consider that material. And when we consider the Board's decision in light of the record it had at its disposal at the time it rendered that decision, we cannot say that its decision was arbitrary and capricious, or clearly erroneous. Accordingly, we decline to disturb the Board's decision dismissing JLPR's protest.

———————